No. 92-262

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

PUBLIC LANDS ACCESS ASSOCIATION, INC.,
LEWIS EUGENE HAWKES, WALTER J. SILLS,
ALBERT C. GEIGER, AND HERMAN J. EARLES,
          Plaintiffs and Respondents,
     -v-

BOONE AND CROCKETT CLUB FOUNDATION, INC.,
AND THE STATE OF MONTANA, DEPARTMENT OF FISH,
WILDLIFE AND PARKS
          Defendants and Appellants.

BOONE AND CROCKETT CLUB FOUNDATION, INC.,
          Third-Party Plaintiff and Appellant,
     -v-

TETON COUNTY, MONTANA,
          Third-Party Defendant and Respondent.

APPEAL FROM:   District Court of the Ninth Judicial District,
               In and for the County of Teton,
               The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Gregory W. Duncan, John P. Poston and Phillip W.
          Strope, Harrison, Loendorf & Poston, Helena, Montana

     For Respondent:

          F.  Woodside Wright, Reynolds, Motl, Sherwood &
          Wright, Helena, Montana; Russell R. Andrews, Teton
          County Attorney, Choteau Montana

     For Amicus:

          Joan B. Newman, University of Montana, Missoula,
          Montana

          Submitted on Briefs:  May 20, 1993

          Decided:  July 8, 1993

FILED
JUL 8 1993
Ed Smith
Filed SUPREME COURT
CLERK OF SUPREME COURT
STATE OF MONTANA

_____
                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Ninth Judicial District Court, Teton County, order filed after a bench trial, which declared that a public prescriptive easement had been established over the road in dispute. We reverse and remand.

We restate the issues on appeal as follows:

I. Did the District Court err in declaring that a public prescriptive easement had been established over the road in question?

II. If there was a public prescriptive easement, was it extinguished by the actions of Clarence Evilsizer?

III. Did the District Court err in concluding that the road in question was a county road due to the application of the "curative statute"?

Respondent Public Lands Access Association, Inc. (PLAA) is a non-profit Montana corporation dedicated to maintaining access to public lands for multiple purposes. The individual respondents are members of the general public; are residents of the State of Montana; are past users of the road in dispute; and are desirous of using the road in the future.

Appellant, Boone and Crockett Club Foundation (BCC), is also a non-profit corporation. BCC purchased the land upon which the disputed road is located as a ranch for scientific and educational purposes and is working in coordination with Amicus Curiae University of Montana conducting research at the ranch. The land is located approximately ten miles west of Dupuyer, Montana.

2

The controversy surrounds a road which is described as starting "in Section 18 of Township 27 North, Range 8 West at the intersection with county road; then proceeding in a northwesterly fashion across Section 18; then in a southwesterly direction through Section 13, Township 27 North, Range 9 West; entering Section 14 in the northernmost portion of Lot 1; continuing in a westerly fashion through Lot 1 and Lot 2 into the northwest quarter of Lot 3; then turning in a southerly direction across Lot 3 of Section 14 to enter Lot 3 of Section 23; and then in a southerly direction across Section 23 to U.S. Forest Service lands and then into the mouth of Dupuyer Canyon." The road is referred to as the Dupuyer-Dupuyer Canyon Road, and it crosses an area known as Johnson's Crossing. Johnson's Crossing serves as the dividing point between the eastern portion of the road, agreed by all parties to be a county road and the disputed portion of the road (disputed road) which lies west of Johnson's Crossing. The disputed portion of the road consists of an unimproved track which leads to the mouth of the North Fork of Dupuyer Creek Canyon.

BCC closes the disputed road to vehicular traffic "right prior to hunting season through the spring . . ." PLAA disputed BCC's power to close this route to vehicle traffic for part of the year because it claimed there existed a public prescriptive easement over the road. However, BCC asserted that there was no public prescriptive easement, but if there ever was, it was extinguished by the actions of the landowners in the 1970s and 1980s.

PLAA brought an action against BCC to force its

3

discontinuation of the walk-in policy and to open the disputed road to vehicular traffic on a year-round basis in order to access the National Forest Service land beyond BCC's ranch. A bench trial was held in the Ninth Judicial District Court in September of 1991. In March of 1992, the court filed its memorandum and order barring and enjoining BCC from interfering with the general public's use of the disputed road, ruling that there was a public prescriptive easement over the disputed road which had been converted to a county road by the curative statute. This appeal by BCC followed.

The standard of review for a district court's findings of fact is provided by Rule 52(a), M.R.Civ.P. Rule 52(a), M.R.Civ.P., provides in pertinent part:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses . . .

In interpreting this rule, we have adopted the following three-part test:

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed."

Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. (Citations omitted.)

"[O]ur standard of review relating to conclusions of law . . . is whether the tribunal's interpretation of the law is correct."

4

Steer Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-475, 803 P.2d 601, 603.

To establish an easement by prescription, the party claiming an easement "must show open, notorious, exclusive, adverse, continuous and uninterrupted use of the easement claimed for the full statutory period. The statutory period is five years." Keebler v. Harding (1991), 247 Mont. 518, 521, 807 P.2d 1354, 1356. (Citation omitted.) See also; Downing v. Grover (1989), 237 Mont. 172, 175, 772 P.2d 850, 852. The burden is on the party seeking to establish the prescriptive easement. Downing, 772 P.2d at 852. "All elements must be proved in a case such as this because 'one who has legal title should not be forced to give up what is rightfully his without the opportunity to know that his title is in jeopardy and that he can fight for it'" Downing, 772 P.2d at 852.

"To be adverse, the use of the alleged easement must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to, and acquiesced in by, the owner of the land." Keebler, 807 P.2d at 1356-1357. "If the owner shows permissive use, no easement can be acquired since the theory of prescriptive easement is based on adverse use." Rathbun v. Robson (1983), 203 Mont. 319, 322, 661 P.2d 850, 852. (Citation omitted.)

I. PUBLIC PRESCRIPTIVE EASEMENT

BCC argues that there was not substantial evidence to conclude that a public prescriptive easement was established over the road in dispute. It contends that the use of the road was not adverse

5

but rather due to neighborly accommodation and courtesy before Fred Troop bought the ranch upon which the road is located. In addition, BCC asserts that the road has been used for access to recreational activities and that these types of activities do not rise to the level necessary to establish a public prescriptive easement. We agree.

Paul Bruner, who has been residing in the area since 1913, and Ken Duncan, who has resided in the area for the past 35 years, both testified that neighborly accommodation was the rule for travel in that area, including the road in question in earlier days. Bruner testified, "like I stated before, in those days that if you had to cross someone else's land to get to your land, there was a --well, I guess you might say a law that if you had to cross somebody else's land to get to your land, why it was legal to cross it, if you maintained it by closing the gates and so on and so forth." Duncan said that when the Conners owned the ranch, the whole area was "open." When asked if it was a kind of neighborly accommodation, Duncan replied, "Yes, certainly."

"A use of a neighbor's land based upon mere neighborly accommodation or courtesy is not adverse and cannot ripen into a prescriptive easement. Thus where the use of a way by a neighbor was by express or implied permission of the owner, it was held that the continuous use of the way by the neighbor was not adverse and did not ripen into a prescriptive right." Wilson v. Chestnut (1974), 164 Mont. 484, 491, 525 P.2d 24, 27.

This case is similar to the Rathbun case, cited above, where

6

the Court concluded that the use of the way had been permissive since 1934. Rathbun, 661 P.2d at 852. Rathbun stated that:

> [s]everal witnesses testified concerning local customs that began in the homesteading days concerning access across another's land. There existed an understanding among landowners that permission was not required every time a person needed to cross his neighbor's land. Permission was automatic if the individual closed the gates and respected his neighbor's property.

Rathbun, 661 P.2d at 852. "The mere use of a way for the required time is generally not sufficient to give rise to the presumption of a grant, and generally some circumstances or act, in addition to the use, tending to indicate that the use was not merely permissive, is required." Wilson, 525 P.2d at 27.

Even PLAA's witnesses describe permissive, not adverse use of the road. Two of the witnesses, the Bredings, resided on the ranch for only a few years on a year round basis. Their testimony regarding their stay at the ranch however, indicates neighborly accommodation as the local custom when the Conner family owned the ranch. Delbert Breding testified that there was a general understanding that the road was always open to the public. Arcelia Conner Breding, Delbert's wife and daughter of the Conner ranch owner, when asked about the use of the road and where the users came from, replied, "Well, from Great Falls and from Conrad. The Boy Scouts and the Girl Scouts from different areas, it was open to them all the time, because my folks figured it was a good recreational place for young people."

Delbert Breding also testified to a specific request for permission to use the road. Mr. Breding testified that the road

7

was not graded until an oil drilling company improved it in order to reach the drilling sites. He testified that the oil company was given permission by the Conners to improve the road.

Perry Nelson, Walter Sills, Herman Earles and Albert Geiger, all PLAA witnesses, testified that when they traversed the road and encountered gates, they went through the gates, but left them as they were found. "The fact that the passage of a road has been for years barred by gates or other obstructions to be opened and closed by the parties passing over the land, has always been considered as strong evidence in support of a mere license to the public to pass over the designated way." Maynard v. Bara (1934), 96 Mont. 302, 307, 30 P.2d 93, 95.

BCC argues that a public prescriptive easement was not established because the use of the road has been primarily for recreational uses and these uses do not rise to the level of adverse possession. For example, the Bredings testified that the road was accessed for the purposes of fishing, camping and sight-seeing. Nelson, Sills, Earles and Geiger stated that their reasons for using the road were to gain access to hunting, fishing and picnicking grounds. "[T]his type of occasional use has been held to be insufficient to raise a presumption of adverse use." Keebler 807 P.2d at 1358.

Donald Hauge, a drilling contractor, testified for the PLAA but he was an infrequent visitor. He hunted there twice in 1961 and hunted in 1962 and 1963. He made infrequent visits after the 1964 flood to see how the flood had affected the land. He was on

8

the road in 1976 but the parking lot for a walk-in access program had already been established. When he reached the parking lot area, he turned around and left. Mr. Hauge also testified that if he was going to work at a drill site, the company would take care of asking for permission to work on the land from the owner so he would not have to bother a landowner for permission before entering their property.

In the trial court's memorandum and order, finding of fact 31 states that the road was used for a multitude of purposes. The court mentions use of the road by stockmen, law enforcement officials, wood gatherers as well as some commercial use. However, the only testimony that stockmen used the road related to BCC's use of the road for its livestock or use by previous owners and/or their lessees. Clarence Evilsizer used the road for his cattle because he had a permit to graze his cattle on Forest Service land. Use by the landowner for his own purposes cannot become a component of a non-owner's claim of adverse possession.

In addition, law enforcement personnel were on the road at the consent or by permission of the landowners. Mr. Evilsizer had an agreement with the federal and local government for access for law enforcement to keep unwanted trespassers off his property. Also, Fish, Wildlife and Parks' personnel were on the premises to enforce the walk-in program's regulations but they were working in cooperation with the landowners.

The commercial use of the road was limited to oil and gas drilling, trapping and outdoor guiding. Robert Sills trapped in

the area in 1975 and 1976, but such period is insufficient to establish a public prescriptive easement. Allen Mathews, a former State Fish and Game warden, related that in 1975, he issued a new outfitter's license to an individual who asked about driving to the Forest Service and then hunting down below. Mathews stated that he would have to get specific written permission from the landowners. The outfitting license is a yearly license so Mathews could only testify about an outfitter using the area for the year 1975. Moreover, when the outfitter did hunt in the area, he parked in the walk-in program's parking lot area which was permissible.

Finally, the only testimony regarding oil and gas companies' use of the road was that the companies asked permission of the landowners to use and improve the road before they entered the property. These uses were either permissive or did not last long enough to establish adverse possession.

We conclude that the trial court's findings of fact are not supported by substantial evidence and that PLAA failed in its burden to establish the existence of a public prescriptive easement over the Dupuyer-Dupuyer Canyon Road west of Johnson's Crossing. DeSaye, 820 P.2d at 1287.

## II. EXTINGUISHMENT OF A PUBLIC PRESCRIPTIVE EASEMENT

Although BCC asserts that there is no public prescriptive easement, it contends that even if there was a public prescriptive easement, it was extinguished by the conduct of owners after the Conners, particularly Clarence Evilsizer. We agree.

Ken Duncan, when asked by Mr. Poston, attorney for BCC, how

10

other owners, Troop, (who purchased the ranch from Conners), Evilsizer and States treated the property, responded as follows:

> Q. Okay, how did Troop treat the property, the use of the road?
> A. He let hunters in with permission.
> Q. But he required permission?
> A. Yes, he did.
> Q. What about Evilsizer and his lessee?
> A. Well, his lessee was there to start with, before Evilsizer moved there, and he was really strict with it. You usually didn't get on his place, and I think he testified the other day that a lot of them left. I think they all left.
> Q. Do you know whether or not the gates were locked, when he was there?
> A. In certain areas, they were.
> Q. Now, how did Mr. States treat the property, when he got there, about letting people on the road?
> A. Well, I had to cross some of States' land to get to this area I leased, this Ahmon place I'm talking about, and I have, since 1973, and if I didn't ask permission form States to cross that land, I would probably, within a half day, I would get a phone call and he would ask if I crossed that land, and I assume he knew every tire tread track that ever crossed his place.

Everett F. Hedrick testified that he lived on the subject property from 1967 through 1972. At this time, the property was owned by Clarence Evilsizer and leased by Mr. Hedrick. Hedrick testified that he allowed people to traverse the road and hunt on the land by permission. Mr. Hedrick also testified that the gates were erected and locked to control the cattle and "to keep the people out of there." Hedrick also stated that some people used the road even if he told them they could not, but if he caught them there, he would try "to run them off."

In his affidavit, Clarence Evilsizer, who bought the ranch from Troop, stated that:

11

"[f]rom approximately 1966 to 1978 I owned what is now known as the Boone and Crockett Club TRM Ranch. . . During my ownership of the ranch, the road in question was always treated as a private road with appropriate signs being placed at beyond Johnson's crossing and with all persons not given specific permission to use the road, which occurred on rare occasions, being asked to and required to get off the property. Most problems of trespass occurred during the hunting season.

Mr. Dean States, who owned the land upon which the road is situated subsequent to Clarence Evilsizer, stated in his affidavit, that:

From approximately 1978 to 1987, my family and I owned and operated what is now known as the Boone and Crockett Club TRM Ranch located at Dupuyer Montana. During our ownership and operation of the ranch, we believed that the road in question in this lawsuit, which has been dubbed the Dupuyer Creek Road, from Johnson Crossing west, was a private road, and we treated it as such with appropriate signs being placed at and beyond Johnson Crossing. Anyone using the ranch for hunting, recreation, or any other purpose was requested to get permission. Anyone caught on the ranch without permission was promptly ejected from the ranch. It was understood by all that permission was necessary if they wanted to use the ranch; and if they were caught on the ranch without permission, they would be ejected. Therefore, I rarely had to eject anyone from the ranch.

In approximately 1972, Mr. Evilsizer closed the road to through traffic. Robert Richmond, a National Forest Service supervisor, and Bud Olsen, then Chairperson of the Teton County Commissioners, went to discuss the blockage with Evilsizer. Evilsizer was persuaded by the two men to remove the blockage and the men assured him that Forest Service staff or the Teton County Commissioners would contact the Sheriff to deal with further problems with trespassers on Evilsizer's land.

At about this time FWP approached Evilsizer to work out an agreement to provide access to the road for people who wanted to

12

hunt on the Forest Service land. This was part of a FWP program begun in the 1970s with landowners around the State. The Department would assist in controlling vehicle traffic through private land by issuing vehicle permits for landowners who would allow people to make recreational use of their land but had concerns over uncontrolled vehicle use.

In Evilsizer's case, a special parking area was installed and visitors would park in the lot and could then traverse the road on foot or horseback to access the National Forest land. The Department provided landowners involved in programs like this "walk-in" program with signs which said "Parking Area, Do not drive beyond this point" and "Written Permission Required." FWP provided any other materials which would facilitate a landowner's permission to allow access to their land for recreational users. FWP personnel in the area were also responsible for enforcing the agreement.

Mr. Evilsizer explained the walk-in program in his affidavit:

> In approximately 1973, I entered into an agreement with the Fish and Game Department of the State of Montana to set up a walk-in hunting area. This agreement allowed hunters to park and camp at a location near the fence line running north and south in the SW 1/4 SE 1/4 of Section 14. The fence is not on the property line. The hunters were then allowed to proceed strictly on foot or on horseback from there to the west and south onto and access, if they so desired, the rest of my property which lay between that fence and the forest boundary. The parking area was signed with signs provided by the Fish and Game Department.
> This permissive arrangement seemed to be accepted by everybody and to my knowledge there were very few if any violations of the agreement. I have no knowledge of anyone driving beyond the parking area without permission.

13

The walk-in agreement continued when Dean States purchased the ranch. In his affidavit, he stated:

> [W]hile I owned and operated the ranch, I maintained the walk-in area which had been previously been [sic] established by Clarence Evilsizer and the Montana Fish and Game Department while Clarence Evilsizer owned the property.
> Through an agreement with the Department of Fish, Wildlife and Parks, they also helped me police the area. It is my belief they issued citations to anyone using the area without permission and ejected them from the property.
> During the time we owned the ranch, no lawsuits were initiated against us demanding the road in question, which was blocked, be open to the public or any other individuals.
> At the time I owned the ranch, there were five gates going from Johnson Crossing into the forest service land. Generally, anyone using the property followed the custom in the area and left the gates open if they found them open and closed if they found them closed. Anyone not doing so was asked to leave the ranch if I caught them. If I did not catch them and knew who did it, I would deny them access thereafter.

This agreement has continued through the ownership of the area by BCC. In 1986, BCC entered into a written agreement with FWP.

If a public prescriptive easement had been established, Evilsizer's blocking of the road and the creation and maintenance of the walk-in program evidenced a "distinct and positive assertion of a hostile right...." Taylor v. Petranek (1977), 173 Mont. 433, 438, 568 P.2d 120, 123. The assertion of this right hostile to the owner [the public] must be brought to the attention of the owner and the use must continue for the full prescriptive period. Medhus v. Dutter (1979), 184 Mont. 437, 442-443, 603 P.2d 669, 672.

Section 70-17-111(3) MCA, provides that a servitude is extinguished "...(3) by the performance of any act upon either tenement by the owner of the servitude or with his assent which is

14

incompatible with its nature or exercise [.]" We have held, on the basis of that statute, that if a prescriptive easement exists, subsequent acts inconsistent with the claim by prescription, support the conclusion that the prescriptive easement has been extinguished. Morrison v. Higbee (1983), 204 Mont. 515, 668 P.2d 1025; Downing v. Grover (1989), 237 Mont. 172, 772 P.2d 850.

In those two cases we found that such inconsistent acts, among others, included the establishment of or acquiescence in a permissive use after an act hostile to the claimed prescriptive right. Morrison, 668 P.2d at 1027-1028; Downing, 772 P.2d at 852-853.

Clarence Evilsizer's blocking of the road was a hostile act which established reverse adverse possession because the state and local government, as well as the public cooperated and adhered to the walk-in policy which had been in existence for approximately 17 years. Clarence Evilsizer cooperated in the establishment of the walk-in program in the early 1970s and the program continued until 1988 when PLAA brought an action against BCC. The users and general public acquiesced in Evilsizer's reverse adverse prescription by adhering to the walk-in program. Compliance with the walk-in program was inconsistent with the claim of a public prescriptive easement. Accordingly, any prescriptive easement the public may have acquired in the road was lost.

In addition, in 1988, the county commissioners had the opportunity to establish Dupuyer-Dupuyer Canyon Road west of Johnson's Crossing as a county road. At the February 1988 meeting

15

of the Board of Commissioners, the three Teton County Commissioners denied a petition to open and establish for public use and access the road in dispute. The county commissioners stated that:

> [A]t this time recreational activities would seem to be the greater use. So it is the recommendation of the inspection team to deny the road petition at this time. Also, due to litigation involved in aquiring [sic] right of way aquistion [sic] thru [sic] the Boone & Crockett Club to the National Forest Service Boundary.

The decision to deny the petition to establish the disputed road as a county road confirms acquiescence by the county and the public that the disputed road is a private road.

In conclusion, substantial evidence supports the proposition that prior to Fred Troop's ownership of the BCC ranch area, there was a policy that travellers used the road because of neighborly accommodation. Further, users accessed the road for the purposes of hunting, fishing, picnicking and other forms of recreation. When Fred Troop bought the land from the Conners, he allowed access to the road with permission. Clarence Evilsizer, his lessee and Dean States continued the practice of access by permission. Finally, in the early 1970s, an attempt by Clarence Evilsizer to block the road met with state and local government cooperation to establish a program that would allow public access to the road which would be agreeable to the landowner. The public, thereafter, acquiesced in the established walk-in policy.

We conclude that even if there was a public prescriptive easement, it was clearly extinguished by reverse adverse possession and by the inconsistent acts of road users in acquiescing in the walk-in program for more than the full statutory period.

16

## III.  THE CURATIVE STATUTE

BCC argues that the trial court erred in declaring that the curative statute converted the public prescriptive easement into a county road.  The "curative" statute at issue reads:

> All highways, roads, lanes, streets, alleys, courts, places and bridges laid out or erected by the public or now traveled or used by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such by the partition of real property, are public highways.

Section 32-103, RCM 1947. (repealed in 1959).  The trial court concluded that:

> The record taken as a whole fails to show that the disputed road was laid out or erected by the public, dedicated or abandoned to the public or made such by the partition of real property....

Since the trial court concluded that the road could not become a county road by virtue of its being laid out or erected by the public or dedicated or abandoned to the public, or made such by a partition, then the only choice available to establish that the disputed road is a public road would be that it was "traveled or used by the public," as in a public prescriptive easement. Because we have concluded that there was no public prescriptive easement, then the curative statute could not be applied to create a public road out of the road in dispute.

We hold that the disputed road is not encumbered by a public prescriptive easement nor does it qualify as a county road under the "curative" statute.

REVERSED AND REMANDED for entry of an order consistent with this opinion.

_____
Justice

17

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

July 8, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Gregory W. Duncan and Phillip W. Strope
Harrison, Loendorf & Poston, P.C.
2225 Eleventh Avenue, Suite 21
Helena, MT 59601

F. Woodside Wright
Reynolds, Motl, Sherwood & Wright
405 North Last Chance Gulch
Helena, MT 59601

Russell R. Andrews
Teton County Attorney
P. O. Box 899
Choteau, MT 59422


Joan B. Newman
Attorney at Law
The University of Montana
Missoula, MT 59812

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy