No. 96-034

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

AMERIMONT, INC., A MONTANA CORPORATION,
CALVIN SMITH and ALICE K. SMITH,

Plaintiffs and Appellants,

v.

DAVID E. GANNETT and MONTANA LAND RELIANCE,

Defendants and Respondents.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin,
               The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

               Karl Knuchel, Attorney at Law,
               Livingston, Montana

        For Respondents:

               James J. Masar, Knight & Masar,
               Missoula, Montana

Submitted on Briefs:   July 18, 1996

Decided:   September 30, 1996

Filed:   SEP 30 1996

FILED

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice Charles E. Erdmann delivered the opinion of the Court.

Amerimont, Inc., a Montana corporation, and Calvin Smith and Alice K. Smith appeal from the judgment entered by the Eighteenth Judicial District Court, Gallatin County, decreeing that Amerimont does not have a prescriptive easement over the property of David E. Gannett and the Montana Land Reliance, a non-profit corporation, which holds a conservation easement on Gannett's property. We affirm.

The issue on appeal is whether the District Court erred in concluding that Amerimont does not possess a prescriptive easement over Gannett's property.

FACTS

Amerimont purchased property located in Gallatin County from the Smiths in 1993. The property lies near the town of Manhattan and the legal description of the land is the S½SE¼ of Section 26 and the NE¼ of Section 35 and all of Section 25, all situated in Township 2 North, Range 3 East.

Amerimont's chain of title dates back to 1887 when George Oyler obtained title to the property by homesteading a portion of the ground and purchasing different sections from private individuals. In 1924 George Oyler conveyed title to Robert Oyler, and in 1949 Robert Oyler sold the property to Hugh Smith, Calvin Smith's father. In 1975 Hugh Smith deeded one-half interest in the property to Calvin Smith, and when Hugh Smith died in 1990, Calvin Smith inherited the remaining one-half of the property. In July 1993, the Smiths transferred their interest to Amerimont by

2

conveying fee title to Section 25 and executing a contract for deed on the respective portions of Sections 26 and 35.

In 1992 Gannett acquired title to the SE¼ of Section 36 in Township 2 North, Range 3 East, Gallatin County. Gannett's chain of title dates back to Annie and Enoch Sales who homesteaded the property in 1922. The Saleses conveyed the property to C. W. Zelie in 1928, and in 1930 Gallatin County foreclosed on the property after Zelie failed to pay taxes. Enoch Sales repurchased the property from Gallatin County in 1939 and then sold the land to Elwyn Freeman in 1964. Freeman sold the property to Philip Ver Wolf in 1979, and Ver Wolf conveyed his interest by warranty deed to Keith Fairbank in 1987. Fairbank executed a warranty deed to Gannett in 1992, who later that year conveyed a conservation easement on the entire property to the Montana Land Reliance.

The properties are separated by a tract of land in Section 36, which is owned by the State of Montana. Amerimont and its predecessors in interest accessed the south one-half of Section 25 by crossing Gannett's property on a two-track dirt road. The road is approximately the width of a pickup truck and traverses a heavily grassed area. The roadway was not the only access to the Smiths' property and they and their predecessors periodically used the road to access the homestead on their land and to gain access to the property for agricultural and recreational purposes. A map of the properties and the disputed roadway is shown below.

3



In 1994, Amerimont and the Smiths filed suit against Gannett seeking to establish that they had a prescriptive easement across Gannett's property. The case was tried before the District Court without a jury on January 19 and 20, 1995. On December 14, 1995, the District Court entered its findings of fact, conclusions of law, and order, concluding that Amerimont and the Smiths do not have a prescriptive easement over Gannett's property. On January 2, 1996, the District Court entered judgment in favor of Gannett and the Montana Land Reliance, incorporating its earlier findings of fact and conclusions of law. This appeal followed.

4

## STANDARD OF REVIEW

This Court reviews a district court's findings of fact to determine whether they are clearly erroneous. Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. We have adopted a three-part test to determine whether the findings are clearly erroneous. First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.

We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

## DISCUSSION

Did the District Court err in concluding that Amerimont does not possess a prescriptive easement over Gannett's property?

To establish an easement by prescription, the party claiming the easement must show open, notorious, exclusive, adverse, continuous, and uninterrupted use of the easement claimed for the

full statutory period of five years. Tanner v. Dream Island, Inc. (1996), 275 Mont. 414, 424, 913 P.2d 641, 647-48 (citing Public Lands Access v. Boone & Crockett (1993), 259 Mont. 279, 283, 856 P.2d 525, 527; Keebler v. Harding (1991), 247 Mont. 518, 521, 807 P.2d 1354, 1356). The burden is on the party seeking to establish the prescriptive easement and all elements must be proved. Tanner, 913 P.2d at 648 (citing Public Lands Access, 856 P.2d at 527; Downing v. Grover (1989), 237 Mont. 172, 175, 772 P.2d 850, 852).

If the owner shows permissive use, no easement can be acquired since the theory of prescriptive easement is based on adverse use. Tanner, 913 P.2d at 648 (citing Public Lands Access, 856 P.2d at 527; Rathbun v. Robson (1983), 203 Mont. 319, 322, 661 P.2d 850, 852). Where the use of a way by a neighbor is by express or implied permission of the owner, continuous use of the way by the neighbor is not adverse and does not ripen into a prescriptive right. Public Lands Access, 856 P.2d at 528 (citing Wilson v. Chestnut (1974), 164 Mont. 484, 491, 525 P.2d 24, 27).

Amerimont argues that use of the roadway by the Oylers was sufficient to establish a prescriptive easement and that use by the Smiths was open and notorious to a degree that Gannett should have been placed on notice that the Smiths and their predecessors were making a hostile claim against his ownership. Amerimont claims that its and its predecessors' use was continuous and uninterrupted for the full statutory time period. Amerimont maintains that the historic use of the roadway by the Smiths and the Oylers was under a claim of right and not by privilege or license.

6

Amerimont claims that it established the preliminary requirements of a prescriptive easement, thus creating a presumption of adverse use. According to Amerimont, the burden then shifted to Gannett to establish that the use was permissive or a neighborly accommodation and that Gannett did not bring forth any evidence to rebut the presumption of adverse use. Amerimont argues that the gates across the road were installed to control livestock and restrict public access and that the gates were never meant to keep Amerimont or its predecessors in interest from accessing their property.

Gannett argues that Amerimont and the Smiths failed to prove that their use of the road was open and notorious. Gannett relies on Greenwalt Family Trust v. Kehler (1994), 267 Mont. 508, 885 P.2d 421, to argue that Amerimont must have made a distinct and positive assertion of a right hostile to the owner. Gannett argues that without bringing such an assertion to the owner's attention, neither he nor his predecessors in interest were placed on notice that use of the roadway was hostile. Gannett claims that he cannot now be forced to give up what is rightfully his without ever having had the opportunity to know that his title was in jeopardy.

Gannett also argues that Amerimont failed to prove uninterrupted use because Gannett and his predecessor, Fairbank, required Smith to ask for a key to open the gate when he needed to use the road. According to Gannett, such an arrangement indicates Smith's assent to Gannett's ownership and control of the roadway and that such a position is inconsistent with a claim for a

7

prescriptive easement. Gannett maintains that Amerimont and its predecessors' use of the road began as permissive and that the character of that use never changed. Gannett argues that the ranchers and farmers in the area had always been good friends with strong social ties and a commitment to helping one another. According to Gannett, the close working and social relationships among the landowners engendered a practice of neighborly accommodation with respect to the use of roads across one another's property.

The District Court found as follows:

The court finds that the close working and social relationships among neighbors engendered a custom and practice of "neighborly accommodation" with respect to use of the road across the Gannett property. . . .

The court finds . . . that plaintiffs and their predecessors have crossed the Gannett property with express or implied permission at all times material to this action.

. . . .

Cal Smith testified Gannett and his predecessors generally locked a gate at the beginning of the road at all times pertinent to this action. . . . [T]he court finds that this widespread practice of giving out keys to friends and neighbors reflects the custom and practice of neighborly accommodation in the area . . . .

Defendant Gannett and Keith Fairbank did not give keys to the gate to the Smiths. They required Smiths to obtain permission to cross the Gannett property every time he wanted to visit his property. The practice of locking gates and restricting access to the Gannett property is evidence that plaintiffs' use of the road across the Gannett property has always been and continues to be permissive.

. . . .

8

Even if Mr. Smith and his father, Hugh Smith, intended to establish a right to cross the Gannett property by prescription, the evidence before the court does not show that they placed Gannett or his predecessors on notice of such hostile or adverse claim.

George Oyler's grandson, Enos Oyler, testified that he was acquainted with Gannett's predecessors and that "everybody got permission" to use the property. Oyler stated that after the Saleses moved away, the new owners locked the gate and "you had to ask permission."

Marguerite Fulker, a neighboring landowner, testified she had occasions when she had to go into the southeast quarter of Section 36 to hunt mushrooms with Elwyn Freeman and take sheep across the property. Fulker stated that neighbors in the area got along beautifully. She indicated that "[t]hey'd loan you anything they had . . . and we did everything together."

Cal Smith testified that he worked with the Saleses, the Freemans, and Philip Ver Wolf during haying season. The Smiths used the Freemans' corrals when moving cattle. Smith and Ver Wolf checked on and worked each other's cattle, and on at least one occasion, Ver Wolf helped move the Smiths' cattle to another ranch in Harrison.

Cal Smith also testified in review of his earlier deposition concerning conversations he had with Sales, Freeman, and Ver Wolf:

Q: And then I apparently asked a question that starts with, "Yes," and then I would like you to -- having read your answer that begins at line 16, I would like to have you explain what you said in response to that question with respect to your conversations with Sales. What is Mr. Sales telling you there? Would you read that?

9

A:    We asked a long time ago, we asked Sales about [it].
He said, 'Ah, hell, there's no problem.  You people have
been doing it for years.'  Like I said, that's the way we
get along.

Q:    And I asked, "Okay.   That['s] back to [the]
neighborly accommodation?"  And your answer is --

A:    I said, "Yes."

Q:    And do you recall we talked during that deposition
about neighborly accommodation, do you not?

A:    I recall.

.  .  .  .

Q:    And again, we're talking about the three
predecessors in interest, Sales, Freeman, Ver Wolf, all
said the same things to you?

A:    Yeah, that's the way to the property.

Q:    "You don't need to ask.  Just go right on in there."

A:    That's right, that's the way you get there.

.  .  .  .

Q:    To avoid you having to go through the whole answer,
I'm going to have you begin reading at line 6.  And the
sentence that starts with, "We went when we -- when you
had to go or when you wanted to go --."  Would you read
that and then complete the sentence?

A:    "We went when you had to go or when you wanted to
go, whether it be summer, winter or whatever.  Nobody
said boo, you can't go.  It was a gentlemen's agreement,
I'll put it that way."

Q:    And then I said, "Well, more than gentlemen, could
it be described as being a neighborly accommodation?
It's what one good neighbor would do to another?"  And
your answer is --

A:    "I would hope so, or however you want to say it.
It's just that there was never any problem getting
there."

10

Cal Smith testified that he first remembered needing a key to open the gate when he was in high school. He stated that when Fairbank bought the place, "he did not give me a key." Smith indicated that the first time he learned there was a problem was when Gannett locked the gate and told Smith "I'll leave the key for you." Smith said "[f]ine" and when Gannett failed to give him a key, Smith indicated "I went anyway."

Fairbank testified that when he purchased the property "[w]e put our own lock on the gate . . . fairly early on." He indicated that, for the most part, he maintained a locked gate after that. Fairbank testified that no one told him that Calvin Smith had an absolute right to cross the property and indicated there were times when Smith would borrow a key.

Gannett testified as follows concerning his knowledge of the Smiths' right to access the road across his property:

Q: And up to this point in time, as you've just testified, all the information that was made available to you indicated that the Smiths' use of that quarter section was permissive?

A: Yes.

Q: Now, what inquiry did you make of Mr. Smith with respect to whether or not that was the case?

A: He mentioned -- he, Cal, told me that . . . "If we do sell in two different pieces of property --", he had always had permission to go across the Sales' road quarter section and that's the way he referred to the ground as the "Sales Road quarter section" --

Q: Now, I'd like to stop you there. You've used the word "permission" --

A: Yes.

11

. . . .

Q:    Is that --

A:    That's the exact word he used.  "I have always had permission to go across that property."

Q:    Okay.  Yesterday Mr. Smith testified that he told you that is was an "absolute right" that he had to go across that property.  Do you recall him using the words "absolute right"?

A:    No, he did not.

Q:    Do you recall him using any words that would indicate a use that was other than permissive?

A:    No.

Calvin Smith himself stated that:

> It's always been my understanding that the easement was there when we bought the property.  That we didn't have to tell anybody . . . .

Our review of the record indicates that the District Court's findings are supported by substantial evidence.  The court did not misapprehend the effect of the evidence, nor is this Court left with the definite and firm conviction that a mistake has been committed.

In ordering that Amerimont and the Smiths do not have a prescriptive easement over Gannett's property, the District Court concluded that:

> Plaintiffs have failed to carry their burden of showing that their use of the road across the Gannett property was open and notorious.

> Plaintiffs have also failed to show that their use of the road was "uninterrupted" by the owners of the Gannett property.

> Plaintiffs have also failed to establish that their use of the road was adverse.

12

The first element in establishing a prescriptive right is that the use be open and notorious. We have defined "open and notorious" as a distinct and positive assertion of a right hostile to the rights of the owner and brought to the attention of the owner. Lemont, 887 P.2d at 726-27 (citing Downing, 772 P.2d at 852). In the present case, neither the Smiths nor their predecessors in interest made a distinct and positive assertion to Gannett or his predecessors that a right hostile to the rights of the owner was being made. Amerimont's assertion that the extensive use of the road by the Oylers and the Smiths should have put the owners of the servient ground on notice that the road was being used as a primary access to get to their property is simply insufficient to prove that their use was open and notorious.

The claimant must also prove that the use is continuous and uninterrupted. We have defined "continuous" use as that which is made often enough to constitute notice of the claim to the potential servient owner, and "uninterrupted use" as a use not interrupted by the act of the owner of the land or by voluntary abandonment by the party claiming the right. Lemont, 887 P.2d at 727 (citing Downing, 772 P.2d at 852). While in the present case use of the road may have been continuous, it was not uninterrupted. Gannett's predecessors locked the gate at the beginning of the road and supplied keys to their neighbors, including the Smiths, as a matter of accommodation. However, when Fairbank bought Gannett's property in 1987, Fairbank changed the locks on the gate and did not provide the Smiths with a key. Rather, the Smiths had to ask

13

for the key to open the gate when they needed to use the road. Calvin Smith admitted that he asked both Fairbank and Gannett for keys to the gate as necessary. Such an arrangement clearly interrupted any claim of right which the Smiths allege they had to use the road.

The final requirement in establishing a prescriptive easement is that the use be adverse. To be "adverse" the use must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to and acquiesced in by the owners of the land. Lemont, 887 P.2d at 727. In most instances, adverse use will be proven (or not proven) from the same evidence by which the claimant establishes open, notorious, continuous, and uninterrupted use for the statutory period. Lemont, 887 P.2d at 727.

A use of a neighbor's land based upon mere neighborly accommodation or courtesy is not adverse and cannot ripen into a prescriptive easement. Public Lands Access, 856 P.2d at 528. This Court has consistently reaffirmed this doctrine. See Greenwalt, 885 P.2d at 425; Lemont, 887 P.2d at 728. Furthermore, we have repeatedly held that a landowner should not be forced to give up title to property without notice of the alleged adverse claim and the opportunity to know that his title is in jeopardy. See Unruh v. Tash (1995), 271 Mont. 246, 250, 896 P.2d 433, 436; Greenwalt, 885 P.2d at 424; Downing, 772 P.2d at 852.

Here, Amerimont and its predecessors had the privileged use of the roadway pursuant to the permission and neighborly accommodation

14

extended by Gannett and his predecessors. Residents of the area routinely helped each other with farm and ranch work and the parties and their predecessors understood that this custom and practice included the ability to cross one another's property without having to ask for permission each time, as long as the neighbors had business to attend to, did not abuse recreational privileges, and closed all gates after each passage. The roadway was used by the express or implied permission of the landowner and as a neighborly accommodation to surrounding landowners. Amerimont's and its predecessors' use of the road across the Gannett property was not adverse.

We therefore hold that the District Court correctly interpreted the law when it concluded that Amerimont and the Smiths do not possess a prescriptive easement over Gannett's property.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15

September 30, 1996

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Karl Knuchel
Attorney at Law
Box 953
Livingston MT  59047-0953

James J. Masar
Knight, Maclay & Masar
Box 8957
Missoula MT  59897-8957

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy