No.   96-129

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

AMERIMONT, INC., A MONTANA CORPORATION,
CALVIN SMITH and ALICE E. SMITH,

       Plaintiffs and Appellants,

   v.

M. M. ANDERSON, a/k/a MICHAEL ANDERSON,
and NORMA JEAN ANDERSON,

       Defendants and Respondents.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin,
               The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

       For Appellants:

           Karl Knuchel, Attorney at Law,
           Livingston, Montana

       For Respondents:

           Thomas M. White, Sedivy, Bennett & White,
           Bozeman, Montana

FILED

SEP 30 1996

Filed:

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:   July 18, 1996

Decided:   September 30, 1996

Clerk

Justice Charles E. Erdmann delivered the opinion of the Court.

Amerimont, Inc., a Montana corporation, and Calvin Smith and Alice K. Smith appeal from the judgment entered by the Eighteenth Judicial District Court, Gallatin County, decreeing that Amerimont does not have a prescriptive easement over the property of M. M. Anderson and Norma Jean Anderson. We affirm.

The issue on appeal is whether the District Court erred in concluding that Amerimont does not possess a prescriptive easement over the Andersons' property.

FACTS

Amerimont purchased property located in Gallatin County from the Smiths in 1993. The property lies near the town of Manhattan and the legal description of the land is the S½SE¼ of Section 26 and the NE¼ of Section 35 and all of Section 25, all situated in Township 2 North, Range 3 East.

Amerimont's chain of title dates back to 1887 when George Oyler obtained title to the property by homesteading a portion of the ground and purchasing different sections from private individuals. In 1924 George Oyler conveyed title to Robert Oyler and in 1949 Robert Oyler sold the property to Hugh Smith, Calvin Smith's father. In 1975 Hugh Smith deeded one-half interest in the property to Calvin Smith and when Hugh Smith died in 1990, Calvin Smith inherited the remaining one-half of the property. In July 1993, the Smiths transferred their interest to Amerimont by

2

conveying fee title to Section 25 and executing a contract for deed on the respective portions of Sections 26 and 35.

In 1975 the Andersons acquired Section 29 in Township 2 North, Range 4 East, among other parcels, by warranty deed from Mabel Geraldine McElwee, n/k/a Mabel Geraldine McElwee Vergeront. Section 29 is situated one mile directly east of Amerimont's Section 25 and the two Sections are separated by Section 30, which is owned by the State of Montana and leased to the Andersons. The Andersons' predecessors in interest are Orie and Mabel Geraldine McElwee who purchased the property in 1944. When Orie McElwee died in 1973, Mabel Geraldine McElwee obtained sole ownership of the land.

When the Andersons purchased Section 29, there was a dirt road that entered Section 29 at a point near their home. The roadway branches off from the Spaulding Bridge Road and runs in an east-west direction across the extreme southern boundaries of Sections 29 and 30, eventually leading to the Smiths' residence on Section 25. The roadway is barricaded by a series of gates which have remained closed and at times locked by the Andersons and the McElwees. The road is used for agricultural, recreational, and residential purposes. A map of the properties and the disputed roadway is shown below.

3



In 1994, Amerimont and the Smiths filed suit against the Andersons seeking to establish they had a prescriptive easement across the Andersons' property. The case was tried before the District Court without a jury on January 17 and 18, 1995. On December 18, 1995, the District Court entered its findings of fact, conclusions of law, and order, concluding that Amerimont and the Smiths do not have a prescriptive easement over the roadway passing through Section 29, but instead have permissive use of the road. On January 18, 1996, the District Court entered judgment in favor of the Andersons, incorporating its earlier findings of fact and conclusions of law. This appeal followed.

4

## STANDARD OF REVIEW

This Court reviews a district court's findings of fact to determine whether they are clearly erroneous. Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. We have adopted a three part test to determine whether the findings are clearly erroneous. First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.

We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

## DISCUSSION

Did the District Court err in concluding that Amerimont does not possess a prescriptive easement over the Andersons' property?

To establish an easement by prescription, the party claiming the easement must show open, notorious, exclusive, adverse,

5

continuous, and uninterrupted use of the easement claimed for the full statutory period of five years. Tanner v. Dream Island, Inc. (1996), 275 Mont. 414, 424, 913 P.2d 641, 647-48 (citing Public Lands Access v. Boone & Crockett (1993), 259 Mont. 279, 283, 856 P.2d 525, 527; Keebler v. Harding (1991), 247 Mont. 518, 521, 807 P.2d 1354, 1356). The burden is on the party seeking to establish the prescriptive easement and all elements must be proved. Tanner, 913 P.2d at 648 (citing Public Lands Access, 856 P.2d at 527; Downing v. Grover (1989), 237 Mont. 172, 175, 772 P.2d 850, 852). To be adverse, the use of the alleged easement must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to and acquiesced in by the owners of the land. Lemont Land Corp. v. Rogers (1994), 269 Mont. 180, 185, 887 P.2d 724, 727.

If the owner shows permissive use, no easement can be acquired since the theory of prescriptive easement is based on adverse use. Tanner, 913 P.2d at 648 (citing Public Lands Access, 856 P.2d at 527; Rathbun v. Robson (1983), 203 Mont. 319, 322, 661 P.2d 850, 852). Where the use of a way by a neighbor is by express or implied permission of the owner, continuous use of the way by the neighbor is not adverse and does not ripen into a prescriptive right. Public Lands Access, 856 P.2d at 528 (citing Wilson v. Chestnut (1974), 164 Mont. 484, 491, 525 P.2d 24, 27).

Amerimont claims that the historic use of the roadway was sufficient to establish an easement by prescription over the

6

Andersons' property. Amerimont argues that the Oyler family began using the road in 1887 to reach the homestead on Section 25 and that use of the road continued uninterrupted into the time that the Smiths obtained ownership of the land. Amerimont argues that the use of the road was open and notorious to such a degree that the Andersons should have been placed on notice that the Smiths were making a hostile claim against their ownership.

Amerimont claims that the Smiths and the Oylers used the road under a claim of right and that this claim was clearly known by the Andersons and their predecessors in interest who did nothing to prevent the continued use from 1887 to 1993. Thus, according to Amerimont, the road was used adversely and not as a mere privilege or license revocable at the pleasure of the Andersons or their predecessors in interest. Amerimont acknowledges the existence of gates across the road, but claims that the gates were installed primarily for livestock control and secondarily, to control public access. Amerimont claims that the gates were never meant to keep Amerimont, the Smiths, or the Oylers from accessing their property.

The Andersons argue that from 1946 to 1993 neither they nor the McElwees had a dispute with any neighboring ranchers or property owners, including the Smiths, concerning use of the roadway across their land. The Andersons claim that use of the road by the Smiths and their predecessors was always permissive and therefore never adverse and/or hostile. The Andersons argue that since 1944 they and the McElwees constantly exercised their right

7

to control access passing over Section 29 to neighboring landowners, including the Smiths and the Oylers. The Andersons note that they and the McElwees always closed the series of gates passing over the route and locked the gates on a monthly, if not weekly basis. According to the Andersons, Amerimont and the Smiths failed to prove the elements necessary to establish a prescriptive easement.

The District Court found as follows:

There is abundant evidence by reputable witnesses that homesteaders who initially lived in this area where Amerimont's land is located, particularly the Oyler family, developed the common practice or common rule of allowing or utilizing a neighbor's permissive use to reach land by crossing over each other's land provided the neighbor closed all gates and didn't injure the land.

The record indicates that the Oyler family had friendly and amiable relations [with] all the neighbors in the area particularly Orie and Mabel Geraldine McElwee. Further, the record is clear that Hugh Smith had particularly good neighborly relations with Mike Anderson from 1975 until Mr. Smith's death in 1990. Mike Anderson's testimony regarding his assistance provided to Hugh Smith in opening gates as Mr. Smith would pass through the Anderson property is evidence of "neighborly accommodation".

Because of this long standing friendship among neighboring property owners, including plaintiffs' predecessors in interest, the use of the road crossing the Anderson property was never adverse and/or hostile. Use of the road was always permissive.

The Andersons and their immediate predecessors in interest, the McElwees, have exercised complete dominion over the route passing through Sec. 29 since 1946. They have required as a condition of use that all gates be closed. They locked the gate from the county road on a monthly if not weekly basis.

8

There is no evidence that Amerimont and its predecessors in interest to Sec. 25 ever possessed a key or combination to the gates controlling access to Sec. 29 which have been frequently locked since at least 1944.

The District Court concluded that:

Amerimont and the Smiths have the permissive use of the roadway passing over Sec. 29. Amerimont and the Smiths do not have an easement by prescription over the roadway passing through Sec. 29.

Our review of the record indicates that use of the roadway was allowed as a neighborly accommodation and by permission of the Andersons and their predecessors in interest. George Oyler's grandson, Enos Oyler, testified that he knew the McElwees and had used the roadway going across Section 29. He stated that he worked for a man named Omen whose family was "friends or neighbors" with the McElwees and they had given Omen and his work crew permission to cross the road.

Mrs. Vergeront [Mabel Geraldine McElwee] testified in her deposition as follows:

Q. Mrs. Vergeront, I'd like to ask you some more general questions regarding the customs of your neighbors in allowing each other to use property and cross over property. Can you explain what your understanding was with respect to other neighboring landowners in utilizing their property or when they utilized your property?

A. Permission was always asked.

Q. Now, was permission required every time a neighbor wanted to go across another neighbor's property?

A. It was for us.

. . . .

9

Q. So anytime somebody wanted to use Section 29 they had to specifically ask you each time?

A. Yes.

Q. Was there ever times when you found somebody going across the road on Section 29 that had not asked for permission?

A. Occasionally.

Q. And what happened when you discovered somebody had used or was attempting to use this road without your permission?

A. We always found out what their purpose was on our place and why they hadn't asked permission and explained to them that permission was always required.

Q. Now, you indicated earlier here that you locked the gate and closed the gate to protect your property.

A. Yes.

Q. What on your property was there to protect?

A. Well, the wear and tear on the land for one thing, our crops for another thing, keeping track of our cattle. And we also had a rock quarry that we mined pictured flagstone. And we had to protect that because -- one of [the] reasons for the locks on the gate was that people would come, if we weren't home, and go -- they knew where the rock quarry was and they would take rock. And that was part of our income.

Q. So are you certain that every time you left the property for an extended period of time you would lock the gate?

A. Yes.

Norma Jean Anderson testified that she "absolutely" made a conscious effort to keep people from traveling over the property. She indicated that she and her husband had a congenial relationship with Hugh Smith and that in the late 1970s or early 1980s they

10

began interacting with Calvin Smith instead of his father. Mrs. Anderson testified that Calvin Smith would call in advance to use the roadway across Section 29 and that in her opinion, the calls were to "ask us if it was okay." She indicated that "[y]ou could call [the arrangement] permission" and noted that if she knew in advance that Smith was coming, she would go down and unlock the gates--or if they were unlocked, she would say "[s]ure, go ahead. The gate's open."

Michael Anderson testified as follows:

Q:    After you began ownership in Section 29 in 1975, what was your practice with respect to allowing other people to use this roadway?

A:    Everyone that -- anyone that wanted to use it at any time had to have permission.

Q:    And did you ever deny permission?

A:    Yes.

Q:    With respect to neighbors in the area, did you establish a pattern of their use that implied a permission?

A:    Well, the neighbors always called and sometimes they were denied. If we had the sprinkler pipe out -- I mean, you can't drive over the sprinkler pipe. And so, I wouldn't say even a neighbor that might have had an implied permission if they wanted to use it, they were certainly always entitled to that but they weren't entitled to drive over the sprinkler pipe and we didn't shut off the sprinkler for them.

Q:    When you say, "entitled", what do you mean by that? In your --

. . . .

A:    By virtue of our grant of permission they would -- and sometimes if they needed to go where we were

11

sprinkling, we would outline one of the roads where they could maybe loop around the field or avoid the sprinkler pipe in some fashion.

. . . .

Q:   Backing up.   When you purchased the property, did you find the gates locked?

A:   Yes.

Q:   Did you acquire the keys to the locks on those gates when you purchased the property?

A:   Yes, I did.

Q:   Since that time, have you continued to lock those gates on a regular basis?

A:   Yes.

The record indicates that the Andersons and their predecessors in interest have exercised complete dominion and control over the roadway passing near their home in Section 29.   The evidence indicates that gates over the roadway were used to control not only livestock, but also to restrict access to the property and to protect the property from theft.   Any individuals, including the Smiths and their predecessors in interest, who used the road did so at the express or implied permission of the Andersons and their predecessors in interest.   In Greenwalt Family Trust v. Kehler (1994), 267 Mont. 508, 885 P.2d 421, we stated that where there is a community understanding or a local custom of allowing neighbors to cross the edges of neighboring fields, it is considered permission.   Greenwalt, 885 P.2d at 425.   In the present case, such a pattern of neighborly accommodation persisted for years and we

12

therefore determine that use of the roadway by Amerimont and the Smiths was not adverse and cannot ripen into a prescriptive easement.

We hold that the District Court's findings of fact are supported by substantial evidence and are not otherwise clearly erroneous. The District Court correctly interpreted the law when it concluded that Amerimont and the Smiths do not possess a prescriptive easement over the Andersons' property.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

13

September 30, 1996

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Karl Knuchel
Attorney at Law
P.O. Box 953
Livingston, MT 59047

Thomas M. White, Esq.
Sedivy, Bennett & White
P.O. Box 1168
Bozeman, MT 59771-1168

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy