No. 00-619

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 202

JAMES G. RENNER,

Plaintiff and Respondent,

v.

DAVID NEMITZ, BN LEASING CORPORATION, a Delaware corporation, CITY OF ISMAY, MONTANA, a political subdivision of the State of Montana, MONTANA BANK OF BAKER, N.A., SMALL BUSINESS ADMINISTRATION, an agency of the Government of the United States of America, and all other persons unknown, claiming or who might have any right, title, estate or interest in, or lien or encumbrance upon, the real property described in the Complaint, or any thereof adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto, whether such claim or possible claim be present or contingent, including any claim or possible claim of dower, inchoate or accrued, and the unknown heirs, grantees and devisee of any of such Defendants as may be deceased, and the wife of any heir or devisee, if married, and the unknown owners of said real property,

Defendants and Appellants.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Custer,

The Honorable Gary L. Day, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Page C. Dringman, Patrick N. Dringman, Josephson & Dringman, Big Timber, Montana; James Carr, Miles City, Montana (David Nemitz)

For Respondent:

George W. Huss, Brown & Huss, Miles City, Montana

Submitted on Briefs: December 14, 2000
Decided: October 4, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The appellant, David Nemitz (Nemitz), appeals from an order of the District Court of the Sixteenth Judicial District, Custer County, finding a prescriptive easement over his property in favor of the respondent, James G. Renner (Renner). We affirm in part and reverse in part.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err in finding a prescriptive easement over Nemitz's property in favor of Renner?

¶4 2. Did the District Court err in finding the prescriptive easement was not abandoned?

¶5 3. Did the District Court err in finding that the prescriptive easement was not extinguished by Nemitz's adverse conduct?

We decline to address the threshold issue of whether a prescriptive easement can run against property of a railroad in Montana, because, as discussed below, this issue was not properly preserved for appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶6 This case involves the use of an area of land in Ismay, Montana over a 52-year period from 1948 to 000. The following facts are undisputed. Nemitz and Renner own adjoining property located in Ismay, Montana. Nemitz's property lies generally to the north of Renner's property. Nemitz leased his property in 1976 and then purchased the property in

1982. Prior to his purchase, the property was owned by the Chicago, Milwaukee, St. Paul and Pacific Railroad. Nemitz operates the Ismay Grain Company on the property. There is a public easement (City of Ismay easement) that crosses Nemitz's property roughly from east to west. Renner purchased his property in 1995. Prior to his purchase the property was owned by Wayne Rieger (Rieger) from 1975 to 1995, by Robert and Carol Herbst from 1974 to 1975, and by Jacob and Luella Schell (Jacob and Luella) from 1948 to 1974.

¶7 Renner accesses his property by crossing Nemitz's property from the City of Ismay easement on the north to his property on the south. Renner crosses Nemitz's property in two different places, in order to form a loop driveway at Renner's house. An easement to the west side of the loop was stipulated at trial and is not at issue here. Both the existence and the location of an approximately 100' easement over the east side loop is at issue in this case. To assist the reader, a diagram of the involved area is attached as an appendix to this opinion.

¶8 A series of interactions between the two parties eventually led to Nemitz building a fence across the east side of the loop which prevented its use. Renner then filed a claim to establish an easement over the east side of the loop. Renner identified a number of defendants besides Nemitz on his complaint and also included unknown defendants. Three of the identified defendants, BN Leasing, the Montana Bank of Baker, and the Small Business Administration, were either dismissed or allowed default judgment against them by failing to respond. The other identified defendant, the City of Ismay, indicated at trial it did not wish to contest Renner's claim and it stipulated to exhibits establishing the City of Ismay easement. No defendants unknown at the time of filing the complaint were discovered.

¶9 At trial, both parties presented testimony regarding use of the east side of the loop. Further, both parties presented testimony regarding two possible exits of the east side loop onto the City of Ismay easement. One exit essentially makes a straight line from the Renner household to the City of Ismay easement. This exit goes to the right of the now-existing utility pole and the left of the now-existing Quonset building on the Nemitz property. The other exit turns west and rejoins with the west side of the loop at the point where it meets the City of Ismay easement. This exit travels to the left (south) of the now existing utility pole. Further details of the testimony will be discussed below under each issue.

¶10 After trial on the matter, the District Court found a prescriptive easement over the

Nemitz property for the east side of the loop during the time that the Schell's owned the property, 1948 to 1974. This finding was based on testimony from Clarence and Lloyd Schell (Clarence and Lloyd), two sons of Jacob and Luella Schell. The District Court then found this easement was not later abandoned by Rieger during the time he owned the property, 1975 to 1995, based on his deposition testimony.[1] Finally, the District Court found that Nemitz's activities, from 1995 when Renner purchased his property to 1998 when the fence was built over the east loop, failed to extinguish the prescriptive easement. In making each of these findings, the District Court did not make specific distinctions between the two possible exits of the east side of the loop.

¶11 Based on these findings, the District Court concluded there is an easement over the east side of the loop in Renner's favor. The District Court then granted easements to Renner for both possible exits of the east side of the loop. Based on these findings and conclusions, the District Court ordered all obstructions of both easements removed. Nemitz appeals from that order and is presumably appealing the award of both possible exits, because both were granted by the District Court and both interfere with his use of the Quonset hut. The exit to the right of the pole prevents him from parking vehicles in front of the Quonset for long periods of time and using it as a storefront for customers and repairs. The exit to the left of the utility pole prevents him from parking semi-trucks next to the Quonset in a position so that he can unload grain with an auger into the semi-trucks.

## II. STANDARD OF REVIEW

¶12 The standard of review of a District Court's findings of fact is whether the findings are clearly erroneous. *Wareing v. Schreckendgust* (1996), 280 Mont. 196, 202-03, 930 P.2d 37, 41. In this case, all the alleged errors are based on findings of fact. This Court has adopted a three-part test to determine whether a finding is clearly erroneous:

> 1. We will determine if the findings are supported by substantial evidence;
>
> 2. If the findings are supported by substantial evidence, we will determine if the district court misapprehended the evidence; and
>
> 3. If the findings are supported by substantial evidence and that evidence has not been misapprehended, this Court may still determine whether . . . "a finding is 'clearly erroneous' when . . . a review of the record leaves the court with the definite and firm conviction that a mistake has been committed."

*Daines v. Knight (1995),* **269 Mont. 320, 325, 888 P.2d 904, 906 (citing** *Interstate Prod. Credit Ass'n v. DeSaye* **(1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). The district court is in the best position to observe and judge the credibility of witnesses, therefore, "[w]e will not second guess the district court's determination regarding the strength and weight of conflicting testimony."** *Double AA Corp. v. Newland & Co.* **(1995), 273 Mont. 486, 494, 905 P.2d 138, 142. We review a district court's findings to determine whether substantial evidence supports those findings, not contrary findings.** *Rafanelli v. Dale (1996),* **278 Mont. 28, 37, 924 P.2d 242, 248**.

¶13 The elements necessary to establish a prescriptive easement must be proved at the district court level by clear and convincing evidence. *Wareing*, 280 Mont. at 206, 930 P.2d at 43. If a claimant establishes open, notorious, continuous, uninterrupted and exclusive use of an easement by clear and convincing evidence, a presumption arises that the use is adverse to the servient estate and the burden shifts to the owner to show the use was permissive. *Wareing*, 280 Mont. at 209, 930 P.2d at 45; *Glantz v. Gabel* (1923), 66 Mont. 134, 141, 212 P. 858, 860. The level of proof for abandonment is also basically clear and convincing in order to effect the same underlying policy to preserve established property rights. In *Rieman v. Anderson* (1997), 282 Mont. 139, 145-46, 935 P.2d 1122, 1126, we held that a party claiming that a property right has been abandoned must prove the acts claimed to constitute abandonment are of a character so decisive and conclusive as to indicate clear intent to abandon the easement. The level of proof for extinguishment of an easement by reverse adverse possession is the same as the burden for establishing a prescriptive easement. *Halverson v. Turner* (1994), 268 Mont. 168, 174, 885 P.2d 1285, 1290.

## III. DISCUSSION

¶14 **A. Prescriptive Easements over Railroad Property: Can a prescriptive easement run against a railroad?**

¶15 As an initial matter, we decline to address the threshold issue raised by Nemitz regarding whether a prescriptive easement can run against property of a railroad in Montana, because this issue was not properly preserved for appeal. The general rule is that issues not raised before the trial court and new legal theories are not considered by this Court on appeal because it is unfair to fault the trial court on an issue it was never given an opportunity to consider. *Unified Indus., Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15 (citing *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866). The exceptions to this rule typically apply to criminal cases and, further, are only allowed when constitutional or substantial rights of the parties are at issue. *See generally*

*State v. Finley* (1996), 276 Mont. 126, 915 P.2d 208, *overruled on other grounds by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817. In this case, the only right affected is a property right over an easement. Nemitz cites no authority for the proposition that this easement issue is so substantial that an exception to the general rule should apply. Therefore, we will not consider the issue of prescriptive easements over railroad property in this appeal.

¶16 **B. Easement over the Nemitz Property**

¶17 Before we turn to the questions properly presented on appeal, it is important to note two structural underpinnings that shape our analysis of the District Court's order. First, the remaining issues in this case each involve specific time periods, based on ownership of the servient and dominant estates. The findings of fact and conclusions of law for each earlier time period affect the analysis of the subsequent time periods. In the District Court's order, establishment of the prescriptive easement involves evidence from 1948 to 1974. Abandonment of the easement involves evidence from 1975 to 1995. Extinguishment of the easement involves evidence from 1995 to 1998. In their briefs, the parties incorrectly blend evidence from the various time periods in support of their arguments regarding establishment, abandonment and extinguishment. The following discussion separates the trial evidence into the relevant time periods for proper analysis. Second, as mentioned above, the District Court did not make distinct findings for each possible exit of the east side of the loop. The following discussion addresses the effect of this omission on the parties' relative property interests.

¶18 **1. Did the District Court err in finding a prescriptive easement over Nemitz's property in favor of Renner?**

¶19 Regarding the question of whether a prescriptive easement was established, the parties agree on the controlling law in Montana. The burden at trial on the party seeking to establish the prescriptive easement is to show "open, notorious, exclusive, adverse, continuous and uninterrupted use of the easement for the full statutory period." *Wareing*, 280 Mont. at 206, 930 P.2d at 43 (citing *Swandal Ranch Co. v. Hunt* (1996), 276 Mont. 229, 233, 915 P.2d 840, 843). The statutory period is five years. Section 70-19-401, MCA. The period of prescriptive use by a claimant's predecessors in title inures to the benefit of the claimant. Section 70-19-401, MCA; *Rude v. Marshall* (1917), 54 Mont. 27, 29-30, 166 P. 298, 298.

¶20 Open and notorious use is such that it gives the owner of the servient estate actual

knowledge of the hostile claim, or is of such character as to raise a presumption of notice because it is so obvious that the owner could not be deceived. *Mildenberger v. Galbraith* (1991), 249 Mont. 161, 167, 815 P.2d 130, 134-35 (citing *Collins v. Thode* (1918), 54 Mont. 405, 411-12, 170 P. 940, 941). Continuous and uninterrupted denotes use not interrupted by an act of the owner of the land or by voluntary abandonment by the party claiming the right. *Hitshew v. Butte/Silver Bow County,* 1999 MT 26, ¶ 17, 293 Mont. 212, ¶ 17, 974 P.2d 650, ¶ 17. Open use and notorious use are discussed as one element in our case law, as are continuous use and uninterrupted use. While these may constitute four separate elements, the instant case does not require us to address the distinctions. Adverse use is exercised under a claim of right and not as a mere license revocable at the pleasure of the servient estate. *Public Lands Access Ass'n v. Boone & Crockett Club Found., Inc.* (1993), 259 Mont. 279, 283, 856 P.2d 525, 527. The element of exclusivity, i.e., that the right to use does not depend on a like right in others, *Wareing*, 280 Mont. at 208, 930 P.2d at 44, has not been raised as an issue on appeal, and therefore it will not be discussed here. (2)

¶21 The District Court found a prescriptive easement for the east side of the loop based on testimony of its use from 1948 to 1974 when the Schells owned the property. Four witnesses testified regarding the use of the road during that time period: Clarence, Lloyd, Eugene Garber (Garber), an employer of Jacob and Luella for seasonal ranch work from 1951 to 1966, and Diane Schumacher (Schumacher), a woman who occasionally purchased produce from Luella from 1968 to 1974. In addition, three stipulated exhibits were introduced relative to that time period. These exhibits were aerial photographs taken in 1961, 1967 and 1972. In its conclusions of law, the District Court stated that use by the Schell family met all the requirements of a prescriptive easement.

¶22 Nemitz contends that the District Court's findings of fact are not supported by substantial evidence and therefore, Renner failed to meet his burden of proof for a prescriptive easement. Nemitz argues that the testimony supporting the prescriptive easement is not clear and convincing because it was vague, inconsistent, and insufficient. For example, Lloyd testified the Quonset hut existed during the period of his parents' ownership, 1948 to 1974, even though it was not built until 1982. This argument of insufficient evidence goes towards the elements of open, notorious, continuous and uninterrupted use.

¶23 Nemitz also argues there was no testimony that the use during that time period was adverse or hostile to the servient estate because he speculates that Jacob and Luella may

have had permission from the railroad to cross its property.[3] Specifically, he contends that Lloyd's and Clarence's testimony that they crossed the railroad property without permission does not prove the issue of adverse use because Lloyd and Clarence did not own the property and did not live on the property for the entire time period, but rather visited their parents there.

¶24 Renner asserts that the testimony was consistent, clear and convincing and that this Court must show deference to the determinations of weight and credibility made by the trial court.

¶25 Based on a careful review of the record, we determine that the District Court's findings of open, notorious, exclusive, adverse, continuous, and uninterrupted use of the east side of the loop were not clearly erroneous. Clarence and Lloyd were consistent in that both remembered a loop road with one side that ran straight out from the house that was used regularly. While there may have been inconsistencies in Lloyd's and Clarence's testimony regarding specifics of use from 1948 to 1974, none of the inconsistencies suggest that the east side of the loop did not exist at all. More importantly, none of the inconsistencies suggest their testimony that the road was used openly and continuously is false. Clarence could not remember the exact location of the utility pole, but he clearly remembered the east side of the loop and testified it was used regularly. Lloyd testified that the east side of the loop was used more than the west side of the loop, in contrast to the other witnesses, but he also clearly remembered a looped driveway and remembered that both sides were used by residents and visitors with no restrictions.

¶26 In this case, there was extensive testimony that the west side of the loop has been the primary entrance and exit for the Renner property over the past 50 years, because people would go out the same way they came in after turning around in the parking area by the house. However, it does not matter whether the west side or the east side of the loop was used more or which was the primary entrance. All that matters is that the east side of the loop itself was in fact used in a way that meets the requirements of a prescriptive easement. *See Confederated Salish & Kootenai Tribes v. Vulles* (9th Cir. 1971), 437 F.2d 177, 180 ("Continuous use" such as will establish right-of-way by prescription does not mean constant use; rather, if the claimant used the right-of-way whenever he desired, without interference by the owner of the servient estate, the use was continuous and uninterrupted). Garber acknowledged that during the time period he visited the Schells, 1951 to 1966, while he did not use the east side of the loop himself, he believed there was no extensive period during which the road was not used at all. Schumacher could not

remember the east side of the loop at all, but her testimony stands in stark contrast with the three photographs from that time period that show the east side of the loop. As mentioned, it is the province of the trial court to weigh and resolve the above conflicts in testimony. Our review shows the District Court was not clearly erroneous in its findings. The testimony of Clarence, Lloyd and Garber demonstrates that use of the east side of the looped driveway was open and notorious because it was obvious, and that the use was continuous and uninterrupted because the use occurred during the entire time Jacob and Luella owned the property.

¶27 Nemitz also contends that Clarence and Lloyd do not actually know if their parents had permission to cross the railroad property, and therefore, that Renner failed to establish the element of adverse use. However, Nemitz cites no authority for a requirement of testimony from owners of the dominant estate, as opposed to testimony from residents of and visitors to the dominant estate. Further, § 70-17-109, MCA, allows occupants to maintain actions for easements, as well as owners. Because Renner demonstrated open, notorious, continuous, uninterrupted and exclusive use of the easement, a presumption arose that the use was adverse and the burden shifted to Nemitz to prove that the Schell's use of the east side of the loop was permissive. *Wareing,* 280 Mont. at 209, 930 P.2d at 45. Clarence and Lloyd both testified they used the looped driveway without any restrictions whatsoever. Nemitz failed to introduce any testimony in this regard and did not properly preserve the issue of prescriptive easements against railroads for appeal. Because the property was owned by a railroad, there is simply little testimony on the issue of permission, unlike similar cases on this issue. Therefore, we conclude that the District Court did not err in finding a prescriptive easement over the east side of the loop during the Schell's ownership.

¶28 It is not clear, however, whether the testimony from this time period regarding both of the two possible exits for the east side of the loop meets the requirements of a prescriptive easement. Clarence and Lloyd both testified to the east side of the loop being a road straight out from the house. But Clarence could not remember the location of the utility pole and this indicates either exit could have been used. Two of the photographs indicate that both exits of the east side of the loop were likely used. This lack of specificity indicates it was error for the District Court to find a prescriptive easement over both exits of the east side of the loop based only on testimony and exhibits regarding the use from 1948 to 1974. However, given evidence and testimony regarding the use from 1975 to 1995 discussed under the next issue, this error is harmless. This evidence is specific regarding both exits of the east loop. Further, this evidence shows that even if a

prescriptive easement was not established during the Schell's ownership, the District Court could have found the use from 1975 to 1995 independently established a prescriptive easement. When the trial court makes an error, but sufficient facts are otherwise established by independent evidence and substantial justice has been done such that the error is harmless, this Court will not disturb the ruling of the lower court. Rule 14, M.R. App.P.; Rule 61, M.R.Civ.P.; *Shors v. Branch* (1986), 221 Mont. 390, 398, 720 P.2d 239, 244; *Thompkins v. Fuller* (1983), 205 Mont. 168, 186, 667 P.2d 944, 953.

## ¶29 2. Did the District Court err in finding the prescriptive easement was not abandoned?

¶30 Mere non-use is insufficient to prove abandonment because of the importance of preserving property rights; abandonment must be proven with words or acts that indicate clear intent to abandon. *Rieman*, 282 Mont. at 145-46, 935 P.2d at 1126. The District Court found that Rieger, Renner's predecessor in interest who owned the property from 1975 to 1995, did not abandon the easement to the east side of the loop, but continued to use it in the same manner as the Schells.

¶31 Nemitz argues that he established Rieger's clear intent to abandon the easement because Rieger testified his use was permissive. Nemitz cites *Morrison* for the proposition that permissive use indicates abandonment of a prescriptive easement. *Morrison v. Higbee* (1983), 204 Mont. 515, 521, 668 P.2d 1025, 1028. Nemitz bases his argument on a letter from Rieger to both the parties in which he states, "[I] considered it a privilege to be able to cross their [Nemitz's] property to get to mine." Nemitz also points to similar comments in Rieger's deposition testimony.

¶32 Renner argues that the District Court was correct in finding that Rieger expressed no clear intent to abandon any easements based on Rieger's testimony that he continued to use the road and never sought permission. Renner also cites testimony by Nemitz that Rieger never sought permission to cross his property. Finally, Renner notes Nemitz certified the looped driveway as a public road to the State for gas tax purposes and, therefore, Nemitz could not believe Rieger's use was permissive.

¶33 After a review of the record, we determine that the District Court's finding that Rieger did not abandon his use of the east side of the loop to be based on substantial evidence. The following testimony by Nemitz illustrates that this finding is basically undisputed:

Q. Did Mr. Rieger have a looped roadway that went to his house?

A. Yes, Mr. Rieger had a looped roadway.

Q. Did you see Mr. Rieger using that roadway?

A. Yes, sometimes he used the roadway.

Q. Okay. And did you see people visiting Mr. Rieger use that roadway?

A. Yes.

Q. And did that roadway appear to cross your land?

A. Right then you couldn't tell exactly where our land was. It was before it got surveyed, but I would say that it crossed our land.

Q. Okay. And Mr. Rieger didn't ask your permission to go on your land?

A. No.

Q. And neither did the visitors?

A. No.

Q. And you didn't discuss any neighborly arrangement with Mr. Rieger?

A. No.

Q. In fact, there was no discussion by you and Rieger about his using the land; is that correct?

A. Not that I know of.

Q. He just used the land?

A. Right.

Q. And you could see him using it?

A. Right

Q. And you didn't do anything to stop him from using it?

A. No.

Q. And you didn't do anything to stop his visitors from using it?

A. No.

Q. And Mr. Rieger used this looped roadway from 1976 until he moved in 1995?

A. Well, he probably could have used it in '75, but since we moved there until when he moved out he used the roadway.

Therefore, the District Court did not err in finding no abandonment because the parties agree that Rieger continued to use the east side of the loop without permission.

¶34 However, the District Court did not make any distinctions between each of the possible exits of the east side of the loop. Because the testimony is very specific to each exit, we address each exit here to determine whether it was error for the District Court to find easements over both. Rieger testified to the following:

Q. And that was your course of travel?

A. Before the Quonset was in, if I came on the east side, that's probably the way I went [to the right of the utility pole]. After the Quonset was installed, however, it was the other way [to the left of the utility pole].

Nemitz testified to the following:

Q. And was this [the fence built by Nemitz in 1998 across the east side of the loop] the first action that had ever been taken to stop someone from going down the east side of that looped roadway?

A. Oh, I couldn't say for sure because we unloaded trucks in the Quonset and so

forth, so it would have been probably -- but they could always go on the south side of the pole like the people always did.

Therefore, it is undisputed Rieger used the exit to the right of the utility pole for about 7 years, from 1975 to 1982 when the Quonset was built. Then he used the exit to the left of the utility pole for about 12 years, from 1983 to 1995 when he sold the property. As mentioned above, the District Court could have found that each of these periods of use established a prescriptive easement over the respective exits of the loop, regardless of Clarence's and Lloyd's testimony. Further, this testimony demonstrates it is undisputed the exit to the left of the utility pole was used until 1995. Therefore, the District Court did not err in finding the exit to the left of the utility pole was not abandoned by Rieger.

¶35 The evidence regarding the exit to the right of the utility pole, however, is disputed. The District Court presumably based its finding of no clear intent to abandon the exit to the right of the utility pole on the following testimony by Rieger:

A. "It happened occasionally, but not regularly."

. . .

Q. You never completely stopped doing that [driving between the Quonset and the utility pole]?

A. No, I would say not totally.

. . .

A. Well, I didn't use it. I didn't need to . . . but there was never any regulation or stipulation that I could or couldn't, either way. It just made sense for me not to since there was another way to go that was safer.

Q. Did you believe that you had an easement between the utility pole and the Quonset hut?

A. I never needed an easement. No, I never gave it a thought.

If the findings are supported by substantial evidence and that evidence has not been

misapprehended, this Court will reverse findings of fact "when . . . a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." *Daines*, 269 Mont. at 325, 888 P.2d at 906. While Rieger stated that he occasionally used the exit to the right of the utility pole, his entire testimony relays a firm conviction that he intended his use of this exit to be entirely subordinate to use by the Nemitz operation. Unlike the defendant in *Higbee* who asked permission to use the ditch and signed a license agreement, thereby abandoning the ability to establish a prescriptive easement, 204 Mont. at 521, 668 P.2d at 1028, this case is distinguishable because Rieger never sought permission and none was ever given. But Rieger's testimony of intent, taken together with his actions, clearly indicate he intended to acquiesce to the Nemitz's use of the exit between the Quonset and the utility pole. His letter to the parties states:

Occasionally, I drove on the eastern side of the loop which joins the western side of the loop just south [left] of the power/light pole on the SW side of the Ismay Grain Company metal [Q]uonset. I did not drive between the [Q]uonset and the light/power pole on the SW corner of the [Q]uonset for safety reasons since many times elevator employees would be working in front of the [Q]uonset.

He also testified:

> Q. Would you consider the area between the pole and Quonset hut to be an area that is used in the course of Ismay Grain's business?
>
> A. Yeah. They parked a truck there quite often to load out of the Quonset.

Further, Gene Nemitz, the son of Nemitz, testified that Rieger did drive to the right of the utility pole, but it was to stop and visit or to patronize the Ismay Grain business.

¶36 In light of the agreement between Nemitz and Rieger on Rieger's use of this exit over a 12 year time period, and in light of the fact that Rieger's overall testimony conveys the unmistakable message that he intended his use of the exit to the right of the utility pole to be subordinate to the Ismay Grain business, we conclude the District Court erred in finding no abandonment of this exit. While the District Court did not distinguish between the two exits, we hold that the court was correct in finding no abandonment of the east loop easement exit to the left of the utility pole, but was clearly erroneous in finding no abandonment of the east loop easement exit to the right of the utility pole.

**¶37 3. Did the District Court err in finding that the prescriptive easement was not extinguished by Nemitz's adverse conduct?**

¶38 As mentioned above, the required proof for the extinguishment of an easement is the same as that for establishing a prescriptive easement. *Halverson*, 268 Mont. at 174, 885 P.2d at 1290. The burden of proof for extinguishment is on Nemitz instead of Renner. Based on its finding that Rieger did not abandon the easement to the east side of the loop, the District Court found that the time remaining after Rieger sold the property to Renner, 1995 to 1998, was insufficient for Nemitz to establish extinguishment of the easement under the statutory requirement of five years. Given our holding that distinguishes the two exits of the east side of the loop and our further determination that Rieger abandoned the exit between the utility pole and the Quonset, the extinguishment issue is irrelevant as to this latter exit. As far as the exit to the left of the utility pole, we hold that the District Court did not err in its finding that the prescriptive easement was not extinguished by Nemitz's adverse conduct because the three year time period was insufficient under the statute.

## CONCLUSION

¶39 The District Court's finding of a prescriptive easement over the east side of the loop exiting to the left of the utility pole is affirmed. The District Court's finding of a prescriptive easement over the east side of the loop exiting to the right of the utility pole is reversed. Because the fence put up by Nemitz blocks both exits, the District Court's order to remove obstructions from blocking the easement to the east side of the loop is affirmed.

¶40 Affirmed in part and reversed in part.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE

/S/ TERRY N. TRIEWEILER

1. Rieger did not attend trial, but his deposition testimony was entered by stipulation.

2. There is extensive testimony in the trial transcript regarding the fact that the looped driveway was certified to the State of Montana for about 10 years, 1988 to 1997, as part of the 3 to 4 miles of public road eligible for gas tax funds in Ismay. Neither party argues, however, that the prescriptive easement is defeated because the looped driveway should actually be a public right of way. Rather, because Nemitz personally participated in the certification to the State of Montana, Renner cites this as evidence that Nemitz acquiesced in the existence of an easement and that Nemitz's arguments for abandonment and/or extinguishment of the easement are therefore disingenuous. At any rate, the District Court finding that use of the easement by the Schells, Rieger, and Renner did not depend on anyone else's right, satisfies exclusivity.

3. Although Nemitz combines the elements of open and notorious use with the element of adverse use in his opening and reply briefs, each is treated separately here.