No. 03-459

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 55

IN RE THE MARRIAGE OF

JAMES HEWETT KILLPACK,

      Petitioner and Respondent,

  and

SARA EDWARDS KILLPACK,

      Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                 In and For the County of Lewis and Clark, Cause No. ADR 2002-036,
                 Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Ronald F. Waterman, Gough, Shanahan, Johnson & Waterman,
            Helena, Montana

      For Respondent:

            John L. Hollow, Attorney at Law, Helena, Montana

                        Submitted on Briefs:  January 6, 2004

                                  Decided:  March 9, 2004

Filed:

                    _____
                                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 This case arises from the dissolution of the marriage of James and Sara Killpack, who were married in Wisconsin on June 19, 2000. At the time of their marriage, both Sara and James had children from previous marriages, but James's children did not live with him. Following a prolonged custody dispute between Sara and her former husband, James legally adopted Sara's children. James obtained employment in Helena, Montana, and relocated there shortly after marrying. Sara and the children subsequently joined him in Montana in July 2001. Sara and James spent more than $1.4 million buying land and building a house near Clancy, which was the major asset of the marital estate. However, following the couple's separation, the home sold for only $680,000. On January 29, 2002, James filed a petition for dissolution of marriage in the District Court of the First Judicial District, Lewis and Clark County, which entered its decree of dissolution on April 18, 2003. Sara now appeals. We affirm.

¶2 The appellant raises the following issues on appeal:

¶3 1. Did the District Court err in refusing to enforce the settlement agreement?

¶4 2. Did the District Court err in excluding Sara's monetary losses incurred in entering into the marriage and moving to Montana?

¶5 3. Did the District Court err in its division of the marital estate?

¶6 4. Did the District Court err in allocating amounts already paid to Sara as maintenance and child support?

¶7 5. Should the District Court have awarded on-going maintenance?

2

¶8 We review a District Court's division of marital property to determine whether the findings of fact on which the division is based are clearly erroneous. *In re Marriage of Rolf,* 2003 MT 194, ¶ 14, 316 Mont. 517, ¶ 14, 75 P.3d 770, ¶ 14. "A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake." *In re Marriage of Gerhart,* 2003 MT 292, ¶ 15, 318 Mont. 94, ¶ 15, 78 P.3d 1219, ¶ 15. District courts have broad discretion pursuant to § 40-4-202, MCA, to distribute the marital estate equitably. *Gerhart,* ¶ 16. Absent either erroneous findings, or an abuse of discretion, we will affirm the distribution of property. *In re Marriage of Pospisil,* 2000 MT 132, ¶ 19, 299 Mont. 527, ¶ 19, 1 P.3d 364, ¶ 19. In a dissolution proceeding, the test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or whether the district court exceeded the bounds of reason resulting in a substantial injustice. *In re Marriage of Engen,* 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26.

*Did the District Court err in refusing to enforce the settlement agreement?*

¶9 On August 21, 2002, the parties advised the court that they did not need to have a hearing on the merits because they had reached an agreement. The agreement was read into the record, and the court was further advised that the full written agreement would be forthcoming. However, because the parties had difficulties agreeing on certain terms, the agreement was not reduced to writing. Meanwhile, thinking she had resolved matters in

Montana, Sara had already moved back to Wisconsin and moved the District Court to enforce the agreement. The District Court refused, finding there was no enforceable agreement. Without a valid agreement to enforce, the District Court held a hearing on the merits of the dissolution in March 2003. Sara now claims that the District Court committed reversible error in not enforcing the agreement. James replies that Sara cannot now raise this issue because she neglected to make the argument at the hearing on the merits and has thus failed to preserve the issue for appeal. Sara retorts that the Montana Rules of Civil Procedure do not allow a motion for reconsideration, and thus, she was precluded from doing anything else to raise the issue.

¶10    The general rule is that we will not address an issue raised for the first time on appeal because it is unfair to fault the trial court on an issue it was never given the opportunity to consider. *Renner v. Nemitz,* 2001 MT 202, ¶ 15, 306 Mont. 292, ¶ 15, 33 P.3d 255, ¶ 15. Furthermore, our policy is to encourage only one appeal from any case and to discourage piecemeal interlocutory appeals. *See, e.g., In re D.A.,* 2003 MT 109, ¶ 19, 315 Mont. 340, ¶ 19, 68 P.3d 735, ¶ 19. In the present case, written motions were submitted regarding the enforceability of the oral agreement, and the District Court entered its order refusing to enforce the agreement. This is sufficient to preserve the issue for appeal.

¶11    We previously addressed situations in which parties make an oral separation agreement but are then unable to reduce their agreement to a writing in *In re Marriage of Simms* (1993), 264 Mont. 317, 871 P.2d 899, and in *In re Marriage of Hayes* (1993), 256

4

Mont. 266, 846 P.2d 272. Settlement agreements are governed by § 40-4-201(1), MCA, which provides in relevant part:

> To promote amicable settlement of disputes between parties to a marriage attendant upon their separation or the dissolution of their marriage, the parties may enter into a *written* separation agreement containing provisions for disposition of any property owned by either of them, maintenance of either of them, and support, parenting, and parental contact with their children. [Emphasis added.]

In both *Simms* and *Hayes*, we refused to enforce separation agreements which were not *in writing*, because § 40-4-201, MCA, only discusses the enforcement of a *written* agreement. *Simms,* 264 Mont. at 325, 871 P.2d at 900; *Hayes,* 256 Mont. at 268, 846 P.2d at 273.

¶12    In the present case, the parties apparently exchanged written drafts of an agreement, but were ultimately unable to agree on key terms. The only agreement in the record is the unsigned document drafted by Sara and attached to her motion to enforce the *oral* agreement. The District Court concluded this was unenforceable because it did not comply with § 40-4-201, MCA. Pursuant to the plain terms of the statute, and our decisions of *Simms* and *Hayes*, we agree.

¶13    However, merely because the oral agreement never matured into an enforceable written agreement does not mean that the parties' work of negotiating the agreement was all for naught. In *Simms,* we stated that although an oral agreement read into the record may not be enforceable in and of itself, parties are nonetheless bound by stipulations made by them, or their counsel, in open court. *Simms,* 264 Mont. at 325, 846 P.2d at 900. Sara contends that pursuant to our decision in *Simms*, decisions as to maintenance and division of property should be based on the parties' stipulations made in open court. This is correct. However,

5

Sara neglects to point to any stipulations which were made by the parties in open court which were subsequently disregarded. Indeed, the record does not include transcriptions of the proceedings of the day in question. Rule 9(b), M.R.App.P., requires a party claiming error to transmit the record. We cannot find error without the record, and we do not have a record of any stipulations made in open court to which the parties are bound.

> *Did the District Court err in the exclusion of Sara's monetary losses incurred in entering into the marriage and moving to Montana?*

¶14 Sara claims to have incurred roughly $300,000 in expenses in relocating her children to Helena to facilitate the marriage. Part of these expenses involved the custody dispute and termination of parental rights of the children's biological father. The District Court excluded these expenses from the marital estate, yet included the expense related to James's adoption of Sara's children. Sara claims that both expenses are causally linked, and it was thus error to exclude the former yet admit the latter.

¶15 James repeatedly asked for documentation of Sara's claimed relocation expenses. Not only was such documentation never forthcoming, the District Court made numerous evidentiary rulings excluding oral references to the claimed expenses as irrelevant and not meeting the best evidence rule. On appeal, Sara makes no claim of error with regard to these evidentiary rulings. Thus, this Court does not now have before it a record relating to the claimed expenses. Further, Sara points to no authority which would support her claim to include relocation expenses. In the absence of supporting evidence or legal authority, we cannot find error with the District Court's ruling.

> *Did the District Court err in the division of the marital estate?*

6

¶16 Both James and Sara are beneficiaries of trusts from their respective families. The parties both contributed their own money and trust money to the marital estate, most of which went towards building their house near Clancy. Sara contributed $3,060 for the house design and $50,000 towards its construction. Sara's trust also contributed $33,122 to the estate. James contributed $1,404,132. James testified that this money came from an advance on his inheritance from his trust and that he was obligated to pay interest on the advance.

¶17 Because James's financial contribution to the marital estate far exceeded Sara's contribution, the District Court awarded James the net proceeds from the sale of the family home. After satisfying the mortgage and paying off two lines of credit, the sale of the house only netted $232,653.28. The court awarded Sara the furniture, worth approximately $20,000, which she had already taken back to Wisconsin.

¶18 Sara claims that each of them made contributions to the house from previously acquired or gifted assets. She urges us to overturn a line of cases interpreting § 40-4-202, MCA, to exclude such assets from the marital estate but entitling the non-acquiring spouse to an equitable share of the appreciated value attributable to his or her endeavors. *See, e.g., In re Marriage of Clark,* 2003 MT 168, ¶ 18, 316 Mont. 327, ¶ 18, 71 P.3d 1228, ¶ 18. Sara urges an interpretation of § 40-4-202, MCA, which would include such items in the marital estate, and thus subject those items to equitable division.

¶19 However, we do not need to address the policy of excluding or including such items from the marital estate. As we said in *Engen,*

7

Whether we have included preacquired, gifted, or inherited property in the marital estate and held that it must be distributed to the spouse to whom it was given or by whom it was preacquired (e.g., *Herron*), or simply held that it is not part of the marital estate (e.g., *Luisi* and *Keedy*), we have consistently treated it differently than property acquired during a marriage through the joint efforts of the couple.

*Marriage of Engen,* ¶ 41.

¶20 Whether the funds used to build the house were previously acquired or gifted assets, the District Court's division of the estate was equitable. The marriage was of short duration, and each party contributed assets which, in large part, were acquired before the marriage. However, since James and Sara had spent large sums of money supporting their lifestyle and had over-invested in their home, it was not possible to merely account for the assets and return them. Their total investment was not recoverable due to the sale price.

¶21 The District Court was apprised of the contributions of each party. It did not mechanically apply any rule but, rather, considered all of the assets and then equitably divided the entire marital estate, including the proceeds from the sale of the house. Here, Sara had contributed $53,000 towards the house. James had contributed over one million dollars, primarily financed by money from trusts of which he is the beneficiary. After the house was sold, and the two lines of credit and mortgage satisfied, the house only netted $232,653.28. Sara had already taken $20,000 worth of furniture. Thus, considering the parties' contributions to the marital estate, their age, previous marriages, occupation, sources of income, the short duration of the marriage, liabilities, and custodial provisions, the court equitably divided the property.

8

*Did the District Court err in allocating amounts already paid to Sara as maintenance and child support?*

¶22 From the beginning of these proceedings, the parties have disagreed about appropriate expenditures. In April 2002, the District Court ordered James to pay $200 per week to Sara and to continue to pay the marital bills and expenses he had been paying to maintain the status quo. However, by continuing to use credit cards, Sara spent far in excess of the $200 per week, and James was paying more than the $200 per week. The resulting combination of Sara's spending and James's previous financial obligations meant that the Killpacks' expenses exceeded James's monthly income. To make the payments of child support to his first family, mortgage payments and credit card payments, James was forced to use the line of credit, driving him further into debt.

¶23 Ultimately, James took action, cancelling Sara's credit cards and withdrawing funds from their joint accounts, leaving her only the $200 per week to spend. Sara moved the District Court to hold James in contempt for violating the temporary maintenance order. In July 2002, after hearing testimony from both parties on their financial situations, the District Court ordered James to pay Sara $2,500 per month, reserving for the final hearing on the merits the allocation between child support and maintenance. Sara was ordered to control her spending.

¶24 At the final hearing in March 2003, James testified and presented a prepared exhibit which totaled and divided the couple's checking account expenditures from January 11, 2002, to the original hearing date of August 11, 2002. The exhibit shows that the total value of checks allocated to Sara and the children totaled $106,997.25. At the hearing, James

argued the appropriate way to allocate the expenditure was to establish the child support and the rest would then be maintenance. In James's proposed findings of fact and conclusions of law, he proposed that $31,866 of that amount was for "non-alimony,"including payments on the mortgage, the line of credit, medicals for the children, and furniture. Because of the lapse of time between preparing the exhibit and the actual hearing date, James also proposed to include $12,500 of maintenance he had paid in the interim, bringing the total to $119,497.25. Subtracting the "non-alimony" and then $19,756 for child support (calculated at $1,796 per month for eleven months) left $67,875.25, which the District Court apportioned as the amount of maintenance Sara received. Sara claims that the ruling is unfair because for income tax purposes, maintenance is regarded as taxable income while child support is not. Further, James benefits from an above the line deduction of the maintenance.

¶25    For authority, Sara cites to our decisions of *In re Marriage of Gerhart* (1990), 245 Mont. 279, 800 P.2d 698, and *In re Marriage of Lundvall* (1990), 241 Mont. 172, 786 P.2d 10. In *Lundvall,* we held that the temporary maintenance paid during the pendency of the proceeding was "non-income producing" and so was not to be considered as "sufficient property to provide for the spouse's needs" in considering an award of future maintenance under § 40-4-203(1)(a), MCA. *Lundvall*, 241 Mont. at 175, 786 P.2d at 12. However, in *Gerhart*, we held that it was equitable to reduce a spouse's share of the property division by the amount of temporary maintenance already received. Neither of these cases has bearing on the apportionment between child support and maintenance of previously paid temporary support. Sara does not dispute the actual calculation of these amounts, nor does

she dispute that the District Court dutifully applied the Montana Child Support Guidelines. Rather, Sara argues that the District Court's determination was arbitrary. The amount allocated to maintenance, $67,875.25, is not, as Sara contends, arbitrary. Rather, it is a function of subtracting the amounts of "non-alimony" and child support from the total amount James paid.

*Should the District Court have awarded on-going maintenance?*

¶26 Lastly, the District Court refused to award Sara future maintenance. The District Court stated that Sara had already received sufficient maintenance under the temporary support order to get a job to sustain herself. Although Sara objects to having any of the money she had already spent characterized as maintenance, she now claims the District Court erred in not awarding her on-going maintenance.

¶27 An award of maintenance is governed by § 40-4-203, MCA, which provides, in pertinent part:

> [T]he court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
> (a) lacks sufficient property to provide for his reasonable needs; and
> (b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Section 40-4-203, MCA.

¶28 The record reveals that Sara has sufficient property to provide for her reasonable needs. Sara is the beneficiary of a trust, from which she has previously made numerous

11

withdrawals. Furthermore, she owns property in Wisconsin valued at over $400,000. Since moving to Wisconsin, she has invested $6,000 in developing the property.

¶29 Sara has a masters degree in clinical psychology from Duke University and needs only to complete her dissertation to obtain her doctorate. However, she has not worked in her field since 1989. She testified that she was not currently employable as a psychologist because she would need to complete 3,000 hours of supervised practice to obtain a license to be able to work as a psychologist. Sara also testified that she could make $75 a day as a substitute teacher but had not yet done so as the necessary paperwork was incomplete. James, who currently works as an administrator at Shodair Children's Hospital and before that worked at a state mental health institute in Wisconsin, testified that at either location, an entry level psychologist without a license, such as Sara, would be employable at a salary in the range of $29,000 to $32,000.

¶30 Furthermore, Sara testified that her previous expenditures, such as airfare and two weeks at resort condominiums in Wisconsin, were necessary for her to be able to relocate there and find a job. The record supports the District Court's statement that Sara had already received adequate maintenance to find a job with sufficient pay to support herself.

¶31 We conclude that none of the District Court's findings were clearly erroneous, nor did the District Court abuse its discretion. We therefore affirm the order of the District Court in its entirety.

/S/ W. WILLIAM LEAPHART

12

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM REGNIER
/S/ JIM RICE

Justice Patricia O. Cotter concurring and dissenting.

¶32    I concur in our resolution of Issues 1 through 4 and dissent from our disposition of Issue 5.

¶33    In my judgment, there were insufficient findings of fact to support the District Court's summary conclusion that Sara was not entitled to maintenance.  This Court notes at ¶ 29 that James testified that either in Wisconsin or Montana, Sara would be employable as an entry level psychologist at an annual salary of $29,000 to $32,000.  However, the District Court found that a person with Sara's academic credentials could earn approximately $30,000 in Helena, Montana.  The only finding concerning Sara's earning  potential in Wisconsin, where she and the children actually reside, is that she earns $75 per day as a substitute teacher.  Sara argues, and I agree, that it was error for the District Court to impute to her an annual income in the state of Wisconsin, when there was no finding that she could earn such sums in Wisconsin, and in light of the fact that she is unlicensed and has not worked in her professional field since 1989.

¶34    I would remand for the entry of findings of fact and conclusions of law consistent with the requirements of § 40-4-203(1), MCA, and, in the event there are insufficient facts

14

in the record to satisfy the analysis required, for a further hearing on the issue of mainte-

nance.  I dissent from our refusal to do so.


/S/ PATRICIA O. COTTER


Justice James C. Nelson concurring and dissenting.

¶35     For the reasons which I expressed in my concurrence and dissent in *In re Marriage*

*of Bee*, 2002 MT 49, ¶¶ 52-60,  309 Mont. 34, ¶¶ 52-60, 43 P.3d 903, ¶¶ 52-60, I join Justice

Cotter's dissent as to Issue 5.  I concur in Issues 1 through 4.


/S/ JAMES C. NELSON