# FILED

05/18/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0462

DA 20-0462

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 123

ROBERT EDWARD WALDEN
and SYLVAN WALDEN,

      Plaintiffs and Appellees,

    v.

YELLOWSTONE ELECTRIC CO.
and THOMAS C. NEWELL,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of McCone, Cause No. DV 17-13
Honorable Katherine M. Bidegaray, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Matthew F. McLean, Kelsey Bunkers, Crowley Fleck PLLP, Bozeman,
            Montana

      For Appellees:

            Jesse Myers, MurphyMyers PLLC, Billings, Montana

            Terrance L. Toavs, Law Office of Terrance L. Toavs, Wolf Point, Montana

                Submitted on Briefs:  March 31, 2021

                      Decided:  May 18, 2021

Filed:

                  _____
                            Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Yellowstone Electric Company and Thomas C. Newell appeal a Montana Seventh Judicial District Court summary judgment decision and order granting attorney's fees, costs, and sanctions. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether the District Court erred in granting summary judgment.*

*Issue Two: Whether the District Court erred in its interpretation of the term "flag person" as used in § 60-7-204, MCA.*

*Issue Three: Whether the District Court erred in awarding attorney's fees and costs under §§ 25-10-303 and -201(2), MCA.*

*Issue Four: Whether the District Court abused its discretion in awarding sanctions for discovery abuse and spoliation of evidence.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 Around 12:00 p.m. on December 21, 2016, Bob Walden and Sylvan Walden (the Waldens) were moving cattle north on a portion of Montana Highway 24. They had placed homemade "Caution Cattle Ahead" signs with bright orange lettering on the side of the road two miles north and 3.7 miles south of the moving herd. Sylvan Walden (Sylvan) was on the side of the road a mile in front of the herd in a pickup truck, hazard lights flashing, with a stock trailer. Bob Walden (Bob) was on horseback trailing the heifers.

¶4 Thomas C. Newell (Newell) was driving a Chevrolet truck (the Chevy) owned by Yellowstone Electric Company (YECO) southbound on Highway 24, which has a posted speed limit of 70 miles per hour. Newell testified that he did not see the "Caution Cattle Ahead" signs. Newell stated in his affidavit that he did see Sylvan in the pickup truck but

2

thought that Sylvan was simply having vehicle trouble or waiting for someone. Newell stated that he was headed uphill and applied the brakes as soon as he saw the herd of cows. Newell subsequently plowed into the livestock, resulting in the death of ten heifers and the totaling of the Chevy driven by Newell.

¶5 The Waldens' counsel sent a notice of representation letter and settlement demand for the loss of their cattle to YECO's insurance on February 5, 2017. Several days later, in response to a letter from its insurance carrier, YECO mailed in the keys and executed title to the Chevy so it could be salvaged. The Waldens continued to correspond with YECO's insurance carrier, offering to settle their claims for $15,750 plus prejudgment interest in August 2017. Neither YECO nor its insurance carrier made any counteroffer or response, and the Waldens filed suit on November 8, 2017.

¶6 YECO asserted affirmative defenses including contributory and/or comparative negligence and negligence per se, alleging that the Waldens had violated § 60-7-204, MCA, which requires the use of "flag person escorts" when trailing cattle on a public highway. On January 3, 2018, YECO filed a counterclaim against the Waldens for the value of the totaled Chevy, asserting negligence and negligence per se on the basis of § 60-7-204, MCA.

¶7 The Waldens requested an inspection of the Chevy and subsequently served a Notice of Inspection. YECO responded that the inspection was not "proportionate to the issues in the case" or relevant and stated that it "no longer has possession, custody, or control over the 2013 Chevy Silverado." According to Newell, no part of the Chevy had been preserved after the accident. The Waldens did not receive access to the vehicle or the

3

federally-required event data recorder that would have recorded information such as speed, steering, and braking for the five seconds prior to impact. *See* 49 C.F.R. pt. 563 (2011).

¶8 During discovery, YECO made numerous objections and refused to respond to many of the Waldens' written discovery requests. In response to the Waldens' Notice of Deposition, YECO served 18 pages of objections. During deposition of Newell, YECO's M. R. Civ. P. 30(b)(6) designee, YECO's counsel frequently objected, more than 180 times according to the District Court's count.[1]

¶9 The Waldens filed a motion for summary judgment. They submitted their own affidavits as well as an affidavit from a retired Montana Department of Livestock employee opining that the Waldens had complied with all safety protocol and had provided adequate warning to oncoming traffic. Following a hearing, the District Court issued an order granting the Waldens' motion. YECO then filed a Writ of Supervisory Control and Request for Stay and the District Court stayed proceedings until YECO's writ was denied on August 6, 2019. On October 7, 2019, the parties stipulated that the Waldens' damages totaled $20,528.29. After YECO informed the Waldens that it intended to appeal the summary judgment order, the Waldens filed a motion requesting attorney's fees and another requesting sanctions for discovery abuses and intentional spoliation of evidence. Following a hearing, the District Court entered an order imposing sanctions on YECO and awarding attorney's fees and costs to the Waldens. On September 4, 2020, the Waldens received a judgment against YECO for $68,128.74.

---

[1] More facts regarding discovery will be provided as needed throughout the Opinion.

**STANDARD OF REVIEW**

¶10     This Court reviews a district court's summary judgment ruling de novo. *Tacke v. Energy West, Inc.*, 2010 MT 39, ¶ 16, 355 Mont. 243, 227 P.3d 601 (citation omitted). We review interpretation and application of statutes for correctness. *In re T.H.*, 2005 MT 237, ¶ 35, 328 Mont. 428, 121 P.3d 541 (citation omitted). Imposition of sanctions and awards of costs are reviewed for abuse of discretion. *Total Indus. Plant Servs. v. Turner Indus. Grp., LLC*, 2013 MT 5, ¶ 61, 368 Mont. 189, 294 P.3d 363 (citation omitted); *Maloney v. Home & Inv. Ctr., Inc.*, 2000 MT 34, ¶ 27, 298 Mont. 213, 994 P.2d 1124 (citation omitted).

**DISCUSSION**

¶11     *Issue One: Whether the District Court erred in granting summary judgment.*

¶12     YECO first challenges the District Court's grant of summary judgment in favor of the Waldens. The District Court determined that Newell and YECO, as Newell's employer, were negligent as a matter of law in causing the death of the Waldens' cows and rejected YECO's counterclaim for the value of the Chevy. YECO argues that summary judgment was inappropriate, contending that there were unresolved factual disputes as to whether the Waldens or YECO were negligent, including whether the Waldens' warning signage, preceding vehicle, and heifers were in plain sight.

¶13     Summary judgment is appropriate when the moving party demonstrates an absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Albert v. City of Billings*, 2012 MT 159, ¶ 15, 365 Mont. 454, 282 P.3d 704 (citation omitted). Reasonable inferences are to be drawn in favor of the non-moving party. *Fisher v. Swift Transp. Co. Inc.*, 2008 MT 105, ¶ 12, 342 Mont. 335, 181 P.3d 601 (citation omitted).

5

¶14 A negligence claim requires showing that a party has caused damages by breaching a duty. *Henricksen v. State*, 2004 MT 20, ¶ 20, 319 Mont. 307, 84 P.3d 38 (citation omitted); *Brohman v. State*, 230 Mont. 198, 201, 749 P.2d 67, 69 (1988). Because of the prevalence of factual issues in negligence actions, such claims are frequently unsuitable to resolution at summary judgment. *See Peterson v. Eichhorn*, 2008 MT 250, ¶ 24, 344 Mont. 540, 189 P.3d 615. However, summary judgment may be appropriate when reasonable minds "could not draw different conclusions from the evidence." *See Larchick v. Diocese of Great Falls-Billings*, 2009 MT 175, ¶ 55, 350 Mont. 538, 208 P.3d 836 (internal quotation omitted); *Brohman*, 230 Mont. at 201, 749 P.2d at 69 (noting that while negligence issues are "[o]rdinarily . . . better determined at trial," the Court will affirm summary judgment where "it is clear that a party has breached a duty and caused an accident." (internal quotation omitted)).

¶15 The primary issue in this case was whether Newell breached a duty by driving into the Waldens' herd. Drivers in Montana have a:

> duty to look not only straight ahead but laterally ahead as well and *to see that which is in plain sight*. Furthermore, a motorist is presumed to see that which he could see by looking, and he will not be permitted to escape the penalty of his negligence by saying that he did not *see that which was in plain view.*

*Chambers ex rel. Chambers v. Pierson*, 266 Mont. 436, 441, 880 P.2d 1350, 1353 (1994) (emphasis added) (internal quotation omitted).

¶16 The District Court viewed photos and watched a video taken of the section of roadway at issue, concluding that the herd would have been in Newell's plain view. YECO counters that a Montana Vehicle Crash Report indicated that the "crash happened on a [h]illcrest going into the sun" thereby creating a factual dispute of whether the herd was in

6

plain sight. The Waldens argue that the report may not be relied upon because it was never admitted into evidence and constitutes hearsay. YECO responds that the Waldens themselves submitted the report in support of their summary judgment motion and referenced it in their complaint, constituting a waiver of any objection to admissibility.

¶17    However, we need not resolve this issue because Montana drivers also have a duty to proceed "in a careful and prudent manner and at a reduced rate of speed no greater than is reasonable and prudent under the conditions existing at the point of operation, taking into account the amount and character of traffic, *visibility*, weather, and roadway conditions." Section 61-8-303(3), MCA (emphasis added). Furthermore, we have noted that "[d]rivers constantly face" hazards such as "black ice, animals running on the highway, or a chuckhole in the road" and have held that drivers "must be prepared to deal with them safely and not jeopardize other motorists or pedestrians."[2] *Craig v. Schell*, 1999 MT 40, ¶ 33, 293 Mont. 323, 975 P.2d 820. Thus, in addition to avoiding obstacles in plain sight, Newell had a duty to drive at a reasonable and "reduced rate of speed" as necessary to account for limited visibility and be prepared to deal safely with the likelihood of animals on the road.

¶18    Here, the undisputed facts are that Newell drove into a herd of approximately 80 cows at midday after having passed warning signs[3] and a vehicle (with stock trailer) on the

---

[2] The prevalence of animals on Montana's roadways is enhanced by its open range statute. *See* § 27-1-724, MCA.

[3] YECO does not dispute that the signs were in plain sight. As such, Newell is presumed to have seen them, even though he testified that he did not. *Chambers*, 266 Mont. at 441, 880 P.2d at 1353 ("[A] motorist is presumed to see that which he could see by looking.").

side of the road with its hazards on. Even if Newell's view of the herd was obstructed by a "[h]illcrest going into the sun," this would only demonstrate that Newell was not driving at "a reduced rate of speed no greater than reasonable and prudent . . . taking into account . . . visibility" nor was he "prepared to deal" safely with "animals running on the highway." Section 61-8-303(3), MCA; *Craig*, ¶ 32. Reasonable minds looking at the evidence could conclude only that Newell either: (a) failed to see a herd in plain sight or (b) failed to drive at a reduced rate of speed to accommodate limited visibility and safely deal with the potential for animals to be on the highway. Because either possibility constituted a breach of a Newell's duty as a driver causing damage to the Waldens' herd, there was no disputed fact material to whether the Waldens were entitled to a judgment as a matter of law. Therefore, the District Court did not err in granting the Waldens' motion for summary judgment.

¶19     *Issue Two: Whether the District Court erred in its interpretation of the term "flag person" as used in § 60-7-204, MCA.*

¶20     YECO challenges the District Court's conclusion that the Waldens met the statutory requirement that "flag person escorts" accompany cattle being herded on a Montana highway by placing Sylvan in a pickup truck with hazard lights flashing on the side of the road ahead of the herd. *See* § 60-7-204, MCA. Title 60, chapter 7, MCA, does not define "flag person escorts." However, YECO asks that we adopt the definition of "flag person" set out in Title 61, chapter 8, MCA, which requires a "flag person" to be "equipped as required by the rules of the department of transportation." Section 61-8-102(2)(h), MCA.

¶21    Our objective when interpreting a statute is to ascertain legislative intent as set out by the plain meaning of the words used. *The Clark Fork Coalition v. Tubbs*, 2016 MT 229, ¶ 20, 384 Mont. 503, 380 P.3d 771 (citations omitted); *see also* § 1-2-101, MCA (providing that the Court's role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted"). Section 60-7-204, MCA, provides that: "A person who owns, controls, or possesses livestock may not herd or drive more than 10 livestock on an interstate or state primary highway unless the livestock is preceded and followed by *flag person escorts* for the purpose of warning other highway users."  (Emphasis added.)

¶22    YECO asks that we define "flag person escorts" according to § 61-8-102(2), MCA, which provides:

> As used in this chapter, unless the context requires otherwise, the following definitions apply:
>
> .  .  .
>
> (h) "Flag person" means a person who directs, controls, or alters the normal flow of vehicular traffic on a street or highway as a result of a vehicular traffic hazard then present on that street or highway.  This person, except a uniformed traffic enforcement officer exercising the officer's duty as a result of a planned vehicular traffic hazard, must be equipped as required by the rules of the department of transportation.

YECO argues that, because Sylvan was not "equipped as required by the rules of the department of transportation" the Waldens did not meet the requirement that their herd be escorted by "flag person escorts."

¶23    YECO points to § 1-2-107, MCA, which provides that "[w]henever the meaning of a word or phrase is defined in any part of this code, such definition is applicable to the

same word or phrase wherever it occurs, except where a contrary intention plainly appears." Thus, the central question before us is whether there appears a contrary intention to applying the definition of "[f]lag person" found Title 61, chapter 8, MCA, to the term "flag person escorts" as it is used in Title 60, chapter 7, MCA.

¶24 The statutory language defining "[f]lag person" in § 61-8-102(2), MCA, is explicitly self-limiting in that the prefatory language specifically defines the term "[a]s used in this chapter." Of course, such limiting language prefacing the definition of a term does not necessarily preclude us from interpreting that term found elsewhere in the codes in a manner consistent with that definition. *See, e.g.*, *Mountain View Educ. Assn. v. Mountain View Sch.*, 227 Mont. 288, 290-91, 738 P.2d 1288, 1289-90 (1987) (using the definition of "teacher" found in Title 20, MCA when analyzing state benefit eligibility for "schoolteachers" under Title 2, chapter 18, MCA, despite limiting language prefacing the definition); *Department of Revenue v. Gallatin Outpatient Clinic*, 234 Mont. 425, 429-30, 763 P.2d 1128, 1130-31 (1988) (applying the definition of "hospital" provided in Title 50, MCA, to that term as used in the tax statute in Title 15, MCA, despite limiting prefatory language in the definition); *Judicial Standards Comm'n v. Not Afraid*, 2010 MT 285, ¶ 20, 358 Mont. 532, 245 P.3d 1116 (concluding that there was "no clear indication that the statutory definition of 'public office' cannot be referenced for issues arising outside of Title 13").

¶25 Nevertheless, such limiting language may help to demonstrate the "contrary intention plainly appear[ing]" necessary to overcome the presumption under § 1-2-107, MCA, that statutory definitions are universal in their reach. *See Richter v. Rose*, 1998 MT

165, ¶¶ 18-19, 289 Mont. 379, 962 P.2d 583 (declining to apply definition of the term "farm" to the term as used in eminent domain statutes where the Legislature "clearly expressed its intention" through limiting language to confine that definition to the subsequent statutory sections concerning probate valuation); *Billings Firefighters Local 521 Int'l Ass'n of Firefighters v. City of Billings*, 1999 MT 6, ¶ 19, 293 Mont. 41, 973 P.2d 222 (declining to export the definition of "structure" from one chapter to another, noting that the Legislature had "clearly expressed its intention to limit application" of the definition through prefatory language).

¶26    We have previously noted what appear to be "disparate approaches" taken by these lines of cases in determining to what extent limiting prefatory language satisfies the "contrary intention" requirement of § 1-2-107, MCA. *See State v. Pinder*, 2015 MT 157, ¶¶ 14-17, 379 Mont. 357, 350 P.3d 377 (contrasting the "exclusionary" approach of *Richter* and *City of Billings* with the "inclusionary" approach of *Mountain View Educ. Ass'n*, *Gallatin Outpatient Clinic*, and *Not Afraid*). Certainly, some language in these decisions seemed to suggest opposing understandings of the consequence of such prefatory phrases. *Compare Gallatin Outpatient Clinic*, 234 Mont. at 430, 763 P.2d at 1131 (limiting language did "not show the legislature's plain intent" to prevent "the general use of the definitions in other parts of the code, pursuant to § 1-2-107, MCA") *with City of Billings*, ¶ 19 ("The legislature having clearly expressed its intention to limit application of the § 7-1-4121, MCA, definitions, the definition of 'structure' set forth in that statute cannot properly be applied to [the statute in question.]").

¶27 However, the holdings themselves are consistent in demonstrating the common-sense conclusion that such language of limitation *may* be an indication of a "contrary intention" sufficient to overcome the presumption under § 1-2-107, MCA, that definitions have universal applicability. *See Pinder*, ¶ 19 (declining to use the pharmacy definition of "drug" when construing the term in a DUI statute because where "'a contrary intention plainly appears,' § 1-2-107, MCA, does not compel us to apply" the definition beyond its statutorily-described bounds).[4]

¶28 There are, of course, other ways that the Legislature may indicate a "contrary intention" to importing a definition from elsewhere in the Montana Codes. *See, e.g., Pinder*, ¶¶ 18-19 (declining to use the pharmacy definition of "drug" for the DUI statute elsewhere because the purposes of the two provisions were sufficiently disparate to indicate a "contrary intention"). Here, the requirement that the Waldens' herd be preceded by a "flag person escor[t]" is located in Title 60, chapter 7, MCA, titled "Livestock on Highways." Section 60-7-204, MCA. In contrast, the definition of "flag person" set forth in § 61-8-102(2)(h), MCA, falls under the "Traffic Regulation" chapter of the "Motor Vehicles" title, Title 61, chapter 8, MCA. This definition requires that a "flag person" be

---

[4] Unbending reliance on the presumption of universally-applicable definitions could lead to even stranger results in this case. The term "flag" is also defined by § 45-8-215, MCA, as "anything that is or purports to be the official flag of the United States, the United States shield, the United States coat of arms, the Montana state flag, or a copy, picture, or representation of any of the described articles." That same provision states that a person who "desecrat[es]" the flag by purposely or knowingly "publicly mutilat[ing], defil[ing], or cast[ing] contempt upon" it, may be punished by up to ten years in prison. The parties do not make any argument that the Waldens' cattle must be escorted down the road by persons carefully waving—without contempt—an official United States or Montana flag.

12

"equipped as required by the rules of the department of transportation." Section 61-8-102(2)(h), MCA. YECO cites to the Montana Department of Transportation *2016 Montana Flagger Handbook* (Handbook) as the source of these rules.[5]

¶29 A review of this Handbook demonstrates that it is clearly intended for traditional road construction zones where a flagger is stationed on the shoulder of the roadway. The Handbook provides no instruction regarding how a flagger would escort a herd of cattle, and does not contain the terms "cattle," "livestock," or "escort." The obvious inapplicability of the "rules of the department of transportation" referenced by the definition of "flag person" in the "Traffic Regulation" chapter provides context indicating a "contrary intention" to importing that definition to the "Livestock on Highways" chapter. *See* § 1-2-106, MCA (providing that words and phrases are interpreted mindful of their context).

¶30 YECO points out that an annotation to § 60-7-204, MCA, titled "Cross-References" states: "Flag person defined, 61-8-102." Section 1-11-204(2), MCA, states that the code commissioner "shall cause to be prepared for publication with the Montana Code Annotated . . . editorial notes, cross-references, and other matter the commissioner considers desirable or advantageous . . . ." However, "annotations, code commissioner notes, catchlines, or other editorial material included in the Montana Code Annotated may not be construed as part of the legislative text but are only for the purpose of convenience, orderly arrangement, and information." Section 1-11-103(5), MCA; *see also In re T.N.-S.,*

---

[5] *Available at* https://perma.cc/33QZ-BDSX (last visited May 13, 2021)

2015 MT 117, ¶ 35, 379 Mont. 60, 347 P.3d 1263 ("The commissioners' note, however, is not law."). The commissioner's annotation does not establish that the term "flag person escorts" under the "Livestock on Highways" chapter is defined the same as a "flag person" who must comply with the "rules of the department of transportation" under the "Traffic Regulation" chapter.[6]

¶31　For the reasons set out above, the District Court was correct in concluding that the Waldens were not required to comply with the Department of Transportation's Handbook when moving their herd along the highway.

¶32　YECO next argues that, even if the definition of "flag person" from § 61-8-102(2)(h), MCA, does not apply, the Waldens still did not meet the requirement under § 60-7-204, MCA, that the herd be accompanied by "flag person escorts" under the term's plain meaning. According to YECO, dictionary definitions demonstrate that a "flag person" must have a flag. *See Flagman*, *Merriam Webster*, perma.cc/XB5F-Y3GW (last visited May 13, 2021) (defining "flagman" as "a person who signals with a flag");

---

[6] Legislative history here also casts doubt on the notion that Legislature intended the term "flag person escorts" in Title 60, MCA, to reference the definition of "flag person" in Title 61, MCA. *See Stockman Bank of Mont. v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 17, 342 Mont. 115, 180 P.3d 1125 ("When the legislative intent cannot be readily derived from the plain language, or when it is helpful to determine the correct interpretation of the statute, we . . . look to legislative history." (citations omitted)). Prior to 2009, the "Livestock on Highways" chapter required "flag*men* escorts" while the "Traffic Regulation" chapter continued to define only the term "flag person." *See* § 60-7-204, MCA (2007) (emphasis added); § 61-8-102(2), MCA (2007). The 2009 amendments to § 60-7-204, MCA, were made as part of House Bill 37, under which dozens of statutes were changed to gender neutral language but did not alter the meaning or substance of the statutes. 2009 Mont. Laws. ch. 56, § 1933. Thus, the current similarity in syntax between the two terms appears to be coincidental, rather than an indication of an effort to link the two statutory sections.

*Flagperson*, *Wiktionary*, perma.cc/4YWH-Q679 (last visited May 13, 2021) (defining "flag person as "[s]omeone who uses a flag, especially as a form of signaling.").

¶33 This argument is unconvincing. For one, not all dictionaries define the term to require a flag. *See Flag*, *The American Heritage Dictionary of the English Language* 688 (3d ed. 1992) (defining "**flag** *tr.v.*" as "**2.a.** To signal with or as if with a flag. **b.** To signal to stop: *flag down a passing car*. (origin unknown.) –**flag'ger** *n*." (emphasis in original)); *Flagman*, *Dictionary.com*, perma.cc/RFX3-U79M (last visited May 13, 2021) (defining "flagman" as "a person who signals with a flag *or lantern*, as at a railroad crossing" (emphasis added)). Moreover, the Department of Transportation Handbook cited to by YECO instructs flaggers on how to direct traffic using either "flags" or "paddles." *Handbook*, 18-20. Department of Transportation regulations allowed "flag vehicles" to lead oversize commercial vehicles with flashing amber lights and signs, rather than flags. Admin. R. M. § 18.8.510A (2019).[7]

¶34 Notably, § 60-7-204, MCA, itself specifically contemplates that "flag person escorts" may in fact be flagless, as it instructs them to use "lamps, lanterns, or rotating beacons" during a nighttime emergency. Clearly, the term in this context speaks to persons providing an adequate warning, not cloth rectangles. The District Court did not err in concluding that the Waldens complied with the requirements of § 60-7-204, MCA, by

---

[7] The term was amended in 2020 from "flag vehicle" to "pilot vehicle" so as to "match industry standards," further demonstrating how the term "flag" has often been used refer to *signaling*, rather than square fabrics. 13 Mont. Admin. Reg. 1258 (Jul. 10, 2020); Admin. R. M. § 18.8.510A (2020).

placing signs stating "Caution Cattle Ahead" on both sides of the herd and preceding the

herd with a pickup truck with emergency lights flashing and towing a stock trailer.

¶35    *Issue Three: Whether the District Court Erred in awarding attorney's fees and costs under §§ 25-10-303 and -201(2), MCA.*

¶36    YECO contends that the District Court erred in awarding attorney's fees under

§ 25-10-303, MCA, which allows plaintiff's reasonable attorney fees:

> [i]n an action involving solely the recovery of property damages arising out of the ownership, maintenance, or use of a motor vehicle, in which the plaintiff secures a judgment equal to or greater than the amount of damages claimed by the plaintiff in the plaintiff's last written offer to the defendant or the defendant's agent prior to the filing of the cause of action . . . .

YECO first points to the title of § 25-10-303, MCA, "Attorney fees—motor vehicle claim,"

and argues that the statute only authorizes attorney's fees for claims regarding damages *to*,

rather than *by*, a vehicle.

¶37    The plain language of the statute addresses claims for "property damages arising out

of the . . . use of a motor vehicle."  Clearly, the Waldens have a claim for "property

damages" (dead cows) "arising" from Newell's "use of a motor vehicle" (driving into said

unfortunate cows).  Nothing in the language of the statute or the section title suggests that

the statute is limited to damages inflicted *upon* a motor vehicle.  Because the plain language

of the statute is unambiguous, we need look no further in interpreting its meaning. *See State

v. Goebel*, 2001 MT 73, ¶ 21, 305 Mont. 53, 31 P.3d 335; *Saucier v. McDonald's Rests. of

Mont., Inc.*, 2008 MT 63, ¶ 70, 342 Mont. 29, 179 P.3d 481 ("[W]e must not insert what

the Legislature has omitted." (citing § 1-2-101, MCA)).

16

¶38 YECO also argues that § 25-10-303, MCA, does not apply because the Waldens submitted a written demand only upon YECO's insurer, not YECO itself. *See* § 25-10-303, MCA (providing for an award of reasonable attorney's fees when a plaintiff wins a judgment "equal to or greater than the amount of damages claimed by the plaintiff in the plaintiff's last written *offer to the defendant or the defendant's agent* prior to the filing of the cause of action" (emphasis added)). The Waldens counter by suggesting that YECO's insurer was acting as YECO's agent. However, we need not resolve this dispute because YECO, though it challenged attorney's fees under § 25-10-303, MCA, generally, did not raise this particular issue below. *See In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38 (noting that the "Court has consistently held that it will not consider issues raised for the first time on appeal").

¶39 Additionally, YECO challenges the applicability of § 25-10-303, MCA, by pointing to the $455 for cleaning and removal of dead and injured cows that was included in the $20,528.29 damages award stipulated to by the parties. YECO argues that the time spent cleaning and removing livestock from the highway does not constitute "property damage" under the statute, rendering the provision of attorney's fees inapplicable. *See* § 25-10-303, MCA (providing for an award of attorney's fees in "an action involving solely the recovery of property damages").

¶40 YECO's argument confuses the definition of "property" with its method of quantification. While labor itself is generally not "property," it can be used as a metric for the damage to a piece of property. For example, while a mechanic's labor to repair a damaged vehicle is not "property," the cost of the mechanic's efforts restoring the vehicle

17

to its original state may be used to measure the property damage incurred during an accident. *See, e.g.*, *Hoenstine v. Rose*, 131 Mont. 557, 564, 312 P.2d 514, 517 (1957) ("'When an automobile has been damaged by the negligence of another and can be repaired, the proper measure of damages is the cost of the repairs and the value of the loss of the use of it while it is being repaired.'" (quoting *Chambers v. Cunningham*, 5 P.2d 378, 379-80 (Okla. 1931))). Thus, quantification of the Waldens' efforts in addressing the aftermath of Newell's collision with their livestock does not necessarily indicate that the action is other than one "involving solely the recovery of property damages." Section 25-10-303, MCA.

¶41 "The law of torts works to ensure that an award of damages restores an injured party as near as possible to the party's pre-tort position—no better, no worse." *Lampi v. Speed*, 2011 MT 231, ¶ 21, 362 Mont. 122, 261 P.3d 1000 (citation omitted). The diminution in market value, or difference between the value of property before and after the injury, is one method of measuring damages. *Lampi*, ¶ 21. The parties have not made us aware of an established market value for dead and dying heifers on a roadway. However, we note that the Waldens incurred a statutory duty to remove their dead animals from the roadway under § 75-10-213, MCA, and an accurate measure of the Waldens' property damage must include the extent to which the collision so devalued their livestock as to render the animals financial liabilities. Absent a more accurate and readily available method, the cost of removing the dead and dying heifers from the roadway to comply with state law is a satisfactory measure for determining this element of the total amount of property damage.

¶42 Moreover, the Restatement (Second) of Torts § 927 (Am. Law Inst. 1979) provides that "any further pecuniary loss" is included in damages resulting from the "destruction or impairment of any legally protected interest in land or other thing." The cost of removing the livestock after the collision was a "further pecuniary loss" resulting from the "destruction or impairment" of the Waldens' legally protected interest in their herd. We have previously adopted analogous sections of the Restatement (Second) of Torts and do so here. *See, e.g.*, *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 36, 388 Mont 259, 165 P.3d 1079 (adopting Restatement (Second) of Torts § 929 (Am. Law Inst. 1979) on measure of damages to real property).

¶43 YECO also argues that the court erred in awarding attorney's fees to the Waldens as defendants in YECO's counterclaims, as § 25-10-303, MCA, addresses only "*plaintiff's* reasonable attorney fees." (Emphasis added.) However, we have previously noted that fees for defense of a counterclaim may be properly included with attorney's fees where litigation of the two claims is "inextricably intertwined." *Estate of Donald v. Kalispell Reg'l Med. Ctr.*, 2011 MT 166, ¶ 45, 361 Mont. 179, 258 P.3d 395 (internal quotation omitted). YECO argues that the fees were separable because the Waldens retained separate counsel for their claim and their defense against the counterclaim. Regardless, to obtain the judgment in their favor, the Waldens had to defeat YECO's counterclaim and contributory negligence affirmative defense, both premised on the same legal argument that the Waldens, rather than YECO, were at fault in the accident. The District Court did not err by determining that the Waldens' defense against YECO's counterclaim was

19

inextricably intertwined with the Waldens' efforts to prosecute their claim against YECO such that it could be included in an award of attorney's fees.

¶44 YECO also contends that the District Court's award of costs was unauthorized by statute. YECO takes issue with the awarded costs for depositions, summary judgment exhibits, and the Waldens' attorney's mileage.

¶45 Section 25-10-201(2), MCA, provides for the recovery of "the expenses of taking depositions." We have interpreted this provision to apply when the depositions were used in a trial setting or filed with and relied upon by the district court. *Fisher v. State Farm Ins. Cos.*, 281 Mont. 236, 239, 934 P.2d 163, 164-65 (1997); *Mularoni v. Bing*, 2001 MT 215, ¶ 53, 306 Mont. 405, 34 P.3d 497. The Waldens filed the deposition transcript with the District Court in its motion for sanctions and the District Court subsequently cited to it in its June 8, 2020 Order. YECO contends that § 25-10-201(2), MCA, relief requires the depositions be relied upon in the summary judgment motion, not a motion for sanctions. *See Mularoni*, ¶ 53 ("We have held that deposition costs are allowed: when a deposition is used at trial as evidence or for impeachment; and when a deposition is filed with the district court, and used by the court in a dispositive summary judgment motion." (citations omitted)). However, we have never held that § 25-10-201(2), MCA, excludes recovery for depositions filed with the court and relied upon in a motion for sanctions, and decline to do so here.

¶46 Section 25-10-201(6), MCA, awards "reasonable expenses of printing papers for a hearing when required by a rule of court." Under M. R. Civ. P. 56, the Waldens were required to serve copies of their exhibits for summary judgment. The District Court did

not abuse its discretion in awarding the Waldens $114.80 in reasonable postage and copying costs.

¶47 Section 25-10-201(1), MCA, provides for an award of "the legal fees of witnesses, including mileage, or referees and other officers," while § 25-10-201(9), MCA, allows for "other reasonable and necessary expenses that are taxable according to the course and practice of the court or by express provision of law." Attorneys are officers of the court, and their presence at court proceedings is reasonable and necessary. It was proper to award $56 in mileage for the Waldens' attorney.

¶48 *Issue Four: Whether the District Court abused its discretion in awarding sanctions for discovery abuse and spoliation of evidence.*

¶49 Finally, YECO takes issue with the District Court's awards of sanctions for YECO's alleged spoliation of evidence in addition to deposition and discovery misconduct. First, citing to *Daley v. Burlington N. Santa Fe Ry. Co.*, YECO argues that the Waldens were not entitled to sanctions because they did not first file a motion to compel and did not file the motion for sanctions until after the discovery deadline. 2018 MT 197, 392 Mont. 311, 425 P.3d 669 (affirming district court decision not to compel discovery or grant default judgment for alleged discovery misconduct where aggrieved party failed to make such motions until a year after their opponent's objections and shortly before the second trial date, well after the close of discovery). However, *Daley* is not instructive here, where the stay of proceedings requested by YECO prevented the Waldens from filing any motions for months during which the petition for a writ of supervisory control was pending. As YECO agreed below, both parties were entitled to continue filing motions once the stay

21

was lifted and YECO cannot now claim that the Waldens did not act swiftly enough when it was YECO's own actions which substantially contributed to any delay.

¶50 Similarly, YECO contends that the Waldens' decision to move for sanctions once they were notified of YECO's intent to appeal demonstrates a retaliatory motive against YECO exercising its right to an appeal. Montana's Rules of Civil Procedure are intended to "secure the just, speedy, and inexpensive determination of every action and proceeding" and this Court discourages piecemeal appeals in favor of receiving "only one appeal from any case." M. R. Civ. P. 1; *In re Killpack*, 2004 MT 55, ¶ 10, 320 Mont. 186, 87 P.3d 393. The Waldens did not demonstrate an improper motive in filing for sanctions before YECO's appeal.

¶51 YECO also argues that the Waldens failed to first meet and confer in good faith before filing a motion for sanctions, citing M. R. Civ. P. 37(a)(1) ("[A] motion [for an order compelling discovery] must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make discovery in an effort to obtain it without court action."). However, the record shows that the Waldens' counsel, on multiple occasions, sent detailed correspondence to YECO, citing authority, requesting that YECO comply with discovery. The Waldens thereby met the requirement that they attempt in good faith to confer with the party failing to make discovery before moving for sanctions.

¶52 YECO also challenges the District Court's award of sanctions for spoliation of evidence. The District Court found that YECO had improperly and without notification to the Waldens allowed YECO's Chevy truck to be destroyed and failed to preserve its data

22

unit. The District Court noted that this evidence would have been critical in assessing the value and condition of the truck as well as in examining YECO's allegation in its counterclaim against the Waldens that Newell had been driving within the posted speed limit and had immediately applied his brakes upon seeing the herd.

¶53 A party has a duty to preserve evidence "when a party in control knows or reasonably should know that existing items or information may be relevant to pending or reasonably foreseeable litigation." *Mont. State Univ.-Bozeman v. Mont. First Judicial Dist. Court*, 2018 MT 220, ¶ 23, 392 Mont. 458, 426 P.3d 541 (citations omitted). YECO argues that the Waldens never asked to inspect the vehicle or indicated an intention to sue before YECO transferred it to their insurer. However, litigation is "reasonably foreseeable" when someone runs into a herd of cattle in eastern Montana and kills 10 cows, especially after receiving correspondence from counsel retained by the owners of the livestock. Moreover, YECO's subsequent decision to file a counterclaim against the Waldens renders the destruction of evidence even more problematic. The District Court did not err in awarding sanctions for evidence spoliation.

¶54 YECO also contends that the District Court abused its discretion in finding sanctions were warranted by YECO's deposition misconduct. M. R. Civ. P. 30(d)(2) authorizes sanctions against one who "impedes, delays or frustrates" the fair examination of a deponent. The District Court found that YECO's counsel had objected to questions during Newell's deposition more than 180 times and that the name of YECO's counsel appeared 219 times on a 212-page deposition transcript.

¶55 YECO counters that—because YECO had designated Newell as its M. R. Civ. P. 30(b)(6) representative—some of the objections were to questions outside the scope of topics listed in the notice of deposition but counsel nevertheless allowed Newell to answer questions within his personal knowledge. YECO also argues that the high quantity of objections was necessary to avoid waiving objections. However, M. R. Civ. P. 32(d)(3)(A-B) provides that only objections to "the form of a question or answer . . . or other matters that might have been corrected at that time" are waived if not raised during the deposition. Additionally, "an excessive number of unnecessary objections may constitute actionable conduct." *Craig v. St. Anthony's Med. Ctr.*, 384 F. App'x 531, 533 (8th Cir. 2010).

¶56 Moreover, as the District Court pointed out, these objections included lengthy speaking objections, attempts to answer on behalf of Newell, hints to Newell on how to answer, and instructions to Newell not to answer a question without any assertion of privilege. M. R. Civ. P. 30(c)(2) requires that an objection "be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

¶57 YECO also takes issue with the District Court's conclusion that the transcript demonstrated that YECO, in choosing Newell—who frequently asserted he was unable to answer questions—as YECO's designated representative under M. R. Civ. P. 30(b)(6), had failed to make a conscientious good-faith endeavor to designate a person having knowledge of the matters in the deposition notice and to prepare that person so they could answer fully

24

and completely. YECO further disputes the District Court's determination that YECO's numerous objections—including eighteen pages of objections to the Waldens' Rule 30(b)(6) deposition notice alone—and refusals to respond to written discovery requests based on a suspect "selective count" of clauses within the Waldens' requests constituted sanctionable discovery abuse. *See Richardson v. State*, 2006 MT 43, ¶¶ 43, 52, 331 Mont. 231, 130 P.3d 634 ("Needless to say, recipients of interrogatories are not entitled to object based on a selective count of the various clauses contained in the requests.").

¶58 District courts are afforded broad discretion in addressing issues of discovery abuse. *Peterman v. Herbalife Int'l, Inc.*, 2010 MT 142, ¶ 23, 356 Mont. 542, 234 P.3d 898. ("District courts are better positioned than we are to evaluate the conduct and good faith of parties during discovery, and as such they enjoy considerable leeway in sanctioning discovery abuses."). Moreover, Montana's Rules of Civil Procedure are intended to "secure the just, speedy, and inexpensive determination of every action and proceeding." M. R. Civ. P. 1. The purpose of discovery is to facilitate broad disclosure and it requires good faith efforts by the parties. *See* M. R. Civ. P. 11, 26(g). This Court has often warned that those who attempt to push the bounds of acceptable discovery conduct do so at their own risk and should not be surprised to meet with consequences. *See Eisenmenger by Eisenmenger v. Ethicon, Inc.*, 264 Mont. 393, 406, 871 P.2d 1313, 1321 (1994) ("Playing loose and fast with the rules of discovery, in the guise of advocacy, is equivalent to playing Russian roulette with only one chamber empty—it cannot be relied upon to lead to a favorable result."); *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 71, 303 Mont. 274, 16 P.3d 1002 ("[T]he imposition of sanctions for failure to comply with discovery

procedures is regarded with favor."); *Seltzer v. Morton*, 2007 MT 62, ¶ 177, 336 Mont. 225, 154 P.3d 561 (noting the Court's "policy of intolerance regarding discovery abuse" (internal quotation omitted)). On this record, YECO cannot show that the District Court abused its discretion in sanctioning it for a variety of discovery abuses.

¶59 Moreover, the District Court's decision to award sanctions in the amount of the Waldens' attorney's fees and costs incurred throughout this lawsuit was within that Court's authority to "impose an appropriate sanction." M. R. Civ. P. 30(d)(2); *see Richardson*, ¶ 56 (noting that the cost of discovery abuse "must be made unbearable to thwart the inevitable temptation that zealous advocacy inspires"); *Spotted Horse v. BNSF Ry. Co.*, 2015 MT 148, ¶ 39, 379 Mont. 314, 350 P.3d 52 (holding that a district court's *failure* to impose a meaningful sanction for evidence spoliation constituted reversible abuse of discretion).

## CONCLUSION

¶60 The District Court correctly interpreted § 60-7-204, MCA, and properly ruled for the Waldens in the parties' cross-motions for summary judgment. Moreover, the District Court correctly awarded fees and costs to the Waldens and did not abuse its discretion in sanctioning YECO for evidence spoliation and discovery abuse.

¶61 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE